EDMUND C. HARTMAN v. COLD SPRING GRANITE COMPANY.[1]

December 10, 1954.

No. 36,301.

*Francis W. Russell, Henry Halladay, Curtis L. Roy,* and *Dorsey, Colman, Barker, Scott & Barber,* for relator.

*Hyman H. Cohen, Willard L. Converse,* and *Robins, Davis & Lyons,* for respondent.

[1]Reported in 67 N. W. (2d) 656.

KNUTSON, JUSTICE.

Certiorari upon relation of the employer to review a decision of the industrial commission awarding compensation to an employee. The award is based upon an alleged traumatic neurosis arising from the cumulative effect of several injuries alleged to have been sustained by the employee, Edmund C. Hartman, while working for the employer, Cold Spring Granite Company.

Prior to his employment by the granite company Hartman had enjoyed good health. He had had the usual childhood diseases from which he had recovered without any difficulty. He had also had an appendectomy which had been successfully performed about in 1943. No inherent tendency toward mental or physical weaknesses was elicited from his family history. From 1930 to 1946 Hartman had worked on his father's farm doing a major portion of the farm work. Occasionally he worked on neighbors' farms and drove a truck for a dray line. In 1944, while employed driving a truck, Hartman was hospitalized for ten days and was treated for a sprained back. Workman's compensation benefits and medical expenses were paid. Hartman testified that he did not recall the sprained back but attributed the hospitalization to "the flu" which affected his kidneys causing back pain. However, the record shows that he was paid compensation and medical benefits for this injury.

On August 18, 1947, when about 30 years of age, Hartman began to work for defendant granite company as a granite polisher, operating by hand an electric polishing machine. His first injury while working for that employer occurred on November 18, 1947, when a bar with which he was lifting a large stone slipped, causing him to lose his footing. Hartman fell on the bar, and his right side was ruptured. A successful operation to correct the hernia was performed by Dr. John F. Kelly of Cold Spring. Hartman returned to work on January 12, 1948, but continued to experience pain. Compensation benefits and medical expenses were paid.

On May 26, 1948, Hartman sustained a second injury for which no compensation was sought.[2] On this occasion a metal bucket and

---

[2]This date was found by both the commission and the referee, although Hartman claims that this injury occurred in 1949. Medical records support the commission's finding.

its contents weighing about ten pounds fell from a height of from 10 to 20 feet from an overhead crane, apparently striking Hartman on the head. While there is some conflict in the testimony as to whether it struck Hartman or merely startled him, the evidence would sustain a finding that the bucket actually struck Hartman on the head. In any event, the fall of the bucket did cause him to fall backward and to bruise his back on some grinding wheel dressers. First aid was given to the bruises on his back, but Hartman claimed that after the bruises healed his back still pained him. Heat treatments were given to alleviate the pain in Hartman's back, but full relief was not obtained. The treatments were discontinued on the attending nurse's theory that the summer heat would improve the condition of Hartman's back.

On August 16, 1949, Hartman sustained a third injury. On that occasion, a swinging crane operated by Hartman failed to function properly, causing a 500-pound stone which Hartman was attempting to place on a rack or "horse" to tip the "horse." As the "horse" tipped, one end of the stone remained on it. The other end struck Hartman midsection and pinned him against another stone momentarily. Hartman shoved the stone away from his stomach and back onto the "horse." This accident caused a second rupture of his right side. The night of the accident Hartman was examined, and arrangements for another herniotomy were made. Hartman attempted to return to work the following day but became ill on account of this hernia and went home to bed until the operation was performed a few days later, again by Dr. Kelly. Two and one-half weeks after the operation Hartman was discharged from the hospital. He continued to experience pain in his right groin during a three-month recuperative period. During this period, Hartman consulted Dr. Kelly at least twice complaining of this pain. With a warning that he should be careful not to incur another rupture, Dr. Kelly permitted Hartman to return to his work in November. Hartman attempted to obtain lighter work with the granite company, but none was available at the time. Within a day or two of this attempt,

Hartman secured permission from the industrial commission to change doctors. On November 12, 1949, he consulted Dr. Herman E. Koop of Cold Spring, who advised him to consult Doctors Hultkrans and Nelson of Minneapolis, specialists in industrial accident cases. On November 14, 1949, Hartman was also examined by Dr. Phil Stangl of St. Cloud upon the recommendation of Dr. Kelly. Consultation by Hartman with Dr. Whitrock of Watkins confirmed Dr. Koop's advice.

In the latter part of November, Hartman was examined by Dr. Harvey Nelson. A month's rest was prescribed and an exploratory operation on the right groin recommended if the pain and swelling in the groin and back had not subsided by the end of that rest period. This recommendation was reported to the granite company. The exploratory operation was performed on January 20, 1950, by Dr. Nelson, but he found no organic malfunction. After his release on January 27, Hartman continued to experience pain, and he consulted with Doctors Hultkrans and Nelson again in April 1950. After March 28, 1950, the granite company ceased to pay further medical expenses and compensation.

During the period from July 24, 1950, to September 1950, Hartman was an outpatient of the University of Minnesota Hospitals. He complained of pain in the left groin and testicle and that he was impotent. A thorough examination failed to reveal any organic cause of the pain. An interne in the hospital made a notation on a medical report indicating that it was his belief that Hartman was suffering from a "compensation neurosis."

In September 1950 Hartman obtained employment as a truck driver. After a day and a half he quit work because of pain and the swelling of his right leg and testicle. He immediately consulted Dr. Koop, who advised him that trucking was too strenuous a job, and he again referred him to Doctors Hultkrans and Nelson. After examination by Dr. Hultkrans, who advised Hartman that "whatever is wrong either it has to disappear or bust," Hartman was examined by Dr. H. B. Hannah, specializing in neurology, upon the

recommendation of Dr. Hultkrans. Dr. Hannah was unable to discover any organic cause for the pain.

On September 14, 1950, a petition for additional compensation was filed, but, after an examination by the doctor to whom Hartman was referred by his attorney which failed to reveal any organic cause of the disability, the petition was dismissed by Hartman's attorney.

On October 11, 1950, Hartman secured employment with Franklin Transformer Company. In his application for employment, he failed to reveal his prior hernial surgery but explained this by the fact that he was afraid that if he revealed such operations he would not be given employment. In his new position he often engaged in strenuous work. He continued to experience pain and had developed a peculiar gait or limp. Hartman was given lighter work temporarily, a fact which he attributed to the discovery of his limp by the foreman and the disclosure to the foreman of his prior herniotomies. Hartman was laid off on November 19, 1950, when the Franklin Transformer Company closed down.

On December 11, 1950, Hartman obtained employment with Lantz Lens Craft Company as a lens grinder. He had filed his application for such employment prior to his employment with Franklin Transformer Company. As part of his duties at the Lantz company Hartman was required to periodically empty a tub of emery dust and water used in the grinding operation. When the tub was full it weighed about 50 pounds. When he was first employed he was able to empty this tub, but later he had to call upon a fellow employee to do so. During the time he was employed at the Lantz company he continued to complain of pain in his legs and groin. The limp which Hartman had when he began to work for the Lantz company grew more pronounced, and he began to sense a twitching in his right arm and leg. He also experienced chills. Between July 26, 1951, and October 21, 1951, he had consulted Dr. Koop of Cold Spring and had received some 24 "shots" for the relief of pain. Hartman terminated his employment with the Lantz company on October 26, 1951, on account of the increase of the pain and stiffness in his

back and legs, which he attributed to the "shots" which he had been taking.

Upon the advice of Dr. Koop, Hartman entered St. Joseph's Hospital in St. Paul on October 30, 1951. The trip to the hospital was made in an ambulance because of Hartman's inability to walk. During this hospitalization, which lasted until November 16, 1951, Dr. C. C. Chatterton, who was then in charge of Hartman, called Dr. John Culligan to examine Hartman. Hartman's complaint of back, groin, and scrotum pain decreased, and he was able to walk by the time he was discharged. He still complained of considerable pain in his back, arms, and legs and a stiffness in his legs. After returning to his home he remained in bed for about six weeks, and during this time he wrote a letter to his attorney threatening to commit suicide unless something was done to take care of his condition. Shortly thereafter Hartman was confined in Mounds Park Hospital in St. Paul for a period of nine days ending January 22, 1952. From the time he was discharged from Mounds Park Hospital, he remained at home in bed the greater part of the time. He occasionally made trips to the grocery store and visited his doctor. Besides the disabilities which have been set forth above, Hartman claims that he has other discomforts, including constipation, palpitation of the heart, headaches, twitching sensation in the right arm and leg, and chill.

There is a great deal of evidence in the case involving the observations of witnesses as to the manner in which Hartman walked. Many witnesses testified that they noticed he had a definite limp and walked in a stooped-over position. Other witnesses testified to the contrary. The best that can be said in this respect is that the evidence is conflicting.

On March 28, 1952, Hartman filed his petition for additional compensation, claiming to be totally disabled on account of the injuries referred to above. The matter was referred to a referee by the industrial commission and came on for hearing on June 18, 1952, and was continued thereafter from time to time until the findings of the referee were made and filed on September 10, 1953.

The referee found that if Hartman suffered any disability following March 28, 1950, said disability bears no causal relation to his accidents of May 26, 1948, or August 16, 1949, while employed by Cold Spring Granite Company, and the referee denied any relief. On appeal to the industrial commission, the findings and conclusion of the referee were reversed. In its opinion attached to its order, the commission found that Hartman is suffering from a neurosis as a result of the cumulative effect of the injuries he had sustained while working for the granite company.

None of the doctors who attended or examined Hartman expressed any opinion as to whether he was suffering from a nervous disorder or a neurosis. Two neurological specialists were called on each side of the case. As we often find in cases of this kind, the two called by the granite company were of the opinion that Hartman was not suffering from a neurosis and the two called by Hartman were of the opposite opinion.

It is the contention of the granite company that determination of the decisive fact in this case rests entirely upon the credibility of Hartman and that, inasmuch as the referee had the opportunity of observing his demeanor and appearance when testifying and the commission did not, the commission is bound to accept the determination of the referee. The granite company proceeds on the theory that the referee, "after seeing the witnesses, hearing their testimony, and studying the record, concluded that Hartman should not be credited." While this is not completely accurate, since the referee simply found that there was no causal connection between any existing disability and the injuries received while working for relator, we may, for the purpose of this decision, assume it to be true that, in so determining, the referee based his finding on the evidence before him, which in the final analysis involved credibility of the witnesses.

■ The issue presented to the referee and to the commission on appeal was simply whether Hartman is suffering from a traumatic neurosis resulting from the cumulative effect of the several injuries and the corrective surgery and medical treatment resulting there-

from or whether he is a malingerer, faking the disability which he claims to have in order to recover compensation. The granite company concedes that if Hartman is a true neurotic he is entitled to compensation. Under our decisions it is clear that traumatic neurosis is compensable if it is the proximate result of the employee's injuries and results in disability. Welchlin v. Fairmont Ry. Motors, 180 Minn. 411, 230 N. W. 897; Rystedt v. Minneapolis-Moline Power Imp. Co. 186 Minn. 185, 242 N. W. 623.

The question presented for our determination is also a rather simple one and involves nothing more than a problem of statutory construction. The question as we see it is this: When a claim petition is referred by the industrial commission to a referee for hearing and determination, is the commission bound by the referee's determination of fact questions when such determination involves the credibility of witnesses?

The respective duties and powers of the industrial commission and its referees must be found from the procedural provisions of our workmen's compensation act. When a claim petition is filed, the commission may proceed to hear it or it may assign it to a commissioner or referee. M. S. A. 176.305, subd. 1.[3] Section 176.305, subd. 3, provides:

"Unless the commission orders differently, where testimony is taken before a commissioner or referee, the testimony is considered as if taken before the commission itself. Where the commission has substituted itself or another commissioner or referee for a commissioner or referee originally assigned to hear a petition, as provided in this chapter, testimony taken before the original commissioner or referee is considered as if taken before the commission or substitute commissioner or referee."

If the petition is referred to a commissioner or referee for hearing, at any time before an award is made the commission may reassign the petition for hearing before itself or to another commissioner or referee (§ 176.311), in which event testimony taken before the origi-

---

[3] All statutory references are to the revised workmen's compensation act enacted by L. 1953, c. 755 (M. S. A. c. 176).

nal commissioner or referee is considered as if taken before the commission or substitute commissioner or referee by virtue of § 176.305, subd. 3, quoted above.

The commission may further refer any question of fact to a commissioner or referee either to hear the evidence and report it to the commission or to make findings of fact and report them to the commission. § 176.381, subd. 1. Under § 176.381, subd. 2, it may refer questions of fact to a commissioner or referee other than the one to whom the petition has been referred. It or a commissioner or referee may make an independent investigation of the facts alleged in the petition. § 176.391.

It is apparent from these statutory provisions that the commission is given broad discretionary powers over the manner in which a petition is to be heard.

If the petition has been referred to a commissioner or referee, an appeal lies to the commission from an award or disallowance on the grounds, among others, that the findings of fact and order are unwarranted by the evidence. § 176.421. On such appeal the commission may (subd. 6) :

"(1) disregard the findings of fact which the commissioner or referee has made;

"(2) examine the testimony and hear other evidence;

"(3) substitute for the findings of fact made by the commissioner or referee such findings as the total evidence requires; and,

"(4) make such award or disallowance of compensation or other order as the facts and findings require."

Where the appeal is based on the ground that the findings or order are unwarranted by the evidence, the commission may (§ 176.441, subd. 1) :

"(1) grant a hearing de novo; or,

"(2) assign the petition for rehearing before a commissioner or referee; or,

"(3) sustain, reverse, or modify the order appealed from."

It may also grant a rehearing after an award within prescribed limits. § 176.461.

The granite company relies heavily upon our decision in Barlau v. Minneapolis-Moline Power Imp. Co. 214 Minn. 564, 9 N. W. (2d) 6. That case involved an appeal from an award of a referee to the commission. One of the commissioners was incapacitated by illness. The other two disagreed, whereupon the commissioner who voted for affirmance ordered that the findings and decision of the referee be affirmed. It must be admitted that there is to be found in our opinion upholding that decision some unfortunate language which seemingly supports the contentions of the granite company here. In posing the question for our determination, we said (214 Minn. 568, 9 N. W. [2d] 8):

"The answer to the question whether there was a decision of the commission by the equal division of the participating members depends upon whether a referee has the power to decide as well as to hear, and whether an appeal from a referee's decision to the commission is the same in essence as an appeal from one court to another."

After a review of the applicable statutory provisions and case law, we find the following language in our opinion (214 Minn. 573, 9 N. W. [2d] 10):

"* * * the power of a referee to decide in the first instance is placed upon the same basis as that of the commission itself. Both derive their powers to decide from the same statute, which uses the same language with respect to each. Because the grant of power to a referee to decide is couched in the same language as that of the grant to the commission itself, the inference is that a referee shall have the same power to decide as the commission.

\* \* \* \* \*

"The language in the provisions relating to appeals is couched in terms applicable to appeals from one court to another. The mode of disposition of appeals from a referee to the commission is similar to that from a trial court to the supreme court. Under § 605.05 (§ 9494), this court, in civil actions, upon an appeal 'may reverse,

affirm, or modify the judgment or order appealed from.' This is not different, in substance, from § 176.57 (§ 4316), which provides that the commission may either sustain or reverse the commissioner's or referee's award or disallowance of compensation or make such modification thereof as it shall deem proper. By assimilating the rules with respect to appeals in the courts to appeals from a referee to the commission, the same rules of law are made applicable. In the very nature of things, there can be no appeal where there is no decision from which to appeal. An appeal presupposes a decision by a lower authority. * * *

\* \* \* \* \*

"* * * Text, context, and history of the statute all show that the legislature intended that a referee should have the power to hear and decide; that a referee's decision should possess finality like that of a trial court; and that an appeal to the commission from a referee's decision should be an administrative appeal, the same in essence as an appeal from a lower to a higher court.

"Where an appeal is taken from a referee's decision to the commission, the commission exercises appellate, not original, jurisdiction. The fact that the commission may hear new evidence, try the case *de novo, in its discretion,* and make its own findings and decision is not inconsistent with a hearing on appeal in its traditional and technical meaning, however inconsistent such a hearing may be with review by writ of error."

In applying this reasoning, we said (214 Minn. 576, 9 N. W. [2d] 12):

"Where the members of an appellate court participating in decision are equally divided in opinion, the judgment or order will be affirmed by operation of law. * * * The plain reason is that there is, in fact, a decision which can only be reversed by the vote of the majority, and where a majority vote is lacking the decision already made must stand. * * *

\* \* \* \* \*

"Our conclusion is that *a referee's decision is final unless reversed on appeal* and that the appeal in the instant case resulted in an affirmance because the members of the commission participating were equally divided in opinion." (Italics supplied.)

Some of the language in that opinion, if taken literally and applied to fact situations not consistent with those under consideration, might lead to an erroneous conclusion. We were there dealing only with the finality of a referee's decision where, on appeal, the commission is equally divided. That the full literal implication of the language was not intended is evidence from the later case of Lappinen v. Union Ore Co. 224 Minn. 395, 29 N. W. (2d) 8. The opinions in both cases were written by the same member of this court. There, as in the Barlau case, an appeal to the commission from a referee's decision was heard upon the record made before the referee. We there said (224 Minn. 406, 29 N. W. [2d] 16) :

"The commission is the finder of the facts in all cases coming before it on appeal from a referee's decision, regardless of whether the appeal is heard upon the record made before the referee or upon such record and additional evidence taken by the commission."

In regard to the respective positions and functions of the referee and commission on such appeal, we said (224 Minn. 411, 29 N. W. [2d] 19) :

"The commission's finding of the facts on appeal upon the record made before the referee is analogous in this respect to findings made by the appellate court under the old chancery practice where the case was tried *de novo* upon the record. * * *

"The rule is different on an appeal where the appellate tribunal, as the commission did here, tries and decides the case upon the record made before a trial tribunal, from what it is on a writ of error or so-called appeal which is in the nature of a writ of error. Under the former, because the appellate tribunal makes its own findings, only the record can be considered. The plaintiff has the burden of proof in the appellate court the same as in the trial tribunal. * * * The usual presumptions in favor of a finding of

the trial tribunal do not obtain. Because the appellate court makes its own findings upon the record the same as if none had been made by the trial court, there are in fact no findings to be bolstered by presumptions. * * *

"* * * The commission's function, as has been pointed out, is not to decide whether the referee has committed error, but to decide the entire case *de novo* upon the evidence before it."

The facts in Olson v. Carlton, 178 Minn. 34, 225 N. W. 921, are quite similar to those now before us. That case involved the question whether or not there was any causal connection between pneumonia causing an employee's death and a previous injury sustained by him. The referee held that there was no such causal connection. The commission reversed on appeal. There, as here, it was urged that the commission was bound by the finding of the referee. We rejected this contention. We there said (178 Minn. 38, 225 N. W. 923):

"Relators advance the proposition that the commission was bound by the finding of the referee if there was any competent legal evidence sustaining such finding and that it was not authorized to substitute its judgment on the effect of the evidence. The familiar rule is invoked which this court applies to itself when reviewing the action of a district court, a jury, or the industrial commission. That rule does not govern on an appeal to the commission from the findings of a referee.

* * * * *

"On appeal to the commission from the action of the referee the commission is a fact-finding body, and its jurisdiction as such must be exercised."

In Hogan v. Twin City Amusement Trust Estate, 155 Minn. 199, 201, 193 N. W. 122, 123, we said:

"* * * The testimony being in conflict, an issue of fact was present and the determination of the question was for the referee, and, on appeal from the referee, for the commission."

Apparently the granite company concedes that such is the law in the usual case but contends that, in a case such as this where

the demeanor of the witness plays a vital role in determining credibility, some other rule ought to prevail. It is difficult to imagine a case where the evidence is conflicting in which credibility of the witnesses—nearly always based to some extent upon the demeanor and appearance—is not involved. To hold that the commission must accept the findings of a referee in cases where credibility of witnesses is involved would require a holding directly contrary to the statute. That the legislature did not so intend is evident from the language of the statutes alone. If the rule now urged upon us were adopted, it would be difficult to apply § 176.305, subd. 3, which provides that, when a petition is referred to a commissioner or referee, the testimony is considered as if taken before the commission and that, when a petition is reassigned to the commission or to another commissioner or referee, the evidence taken before the original referee shall be considered the same as if taken before the commission or the substituted referee. Similarly, the provision that findings of the referee or commissioner to whom the petition is assigned may be disregarded on appeal would become meaningless.

It must be conceded that traumatic neurosis is a type of disability that is extremely difficult to accurately diagnose and rests almost entirely upon subjective symptoms. It may be said that the existence of pain when based on subjective symptoms always involves the credibility of the one claiming to have the pain. However, in determining whether a claimant in such cases is telling the truth, we cannot ignore the testimony of witnesses who have observed his conduct over a long period of time. The probability that he was faking such symptoms as a limp in his walk, his stooped posture, and other manifestations of pain and physical weakness involves a determination not only of Hartman's credibility but also. the credibility of a large number of witnesses who observed him, including doctors as well as laymen.

We do not intend to minimize the importance of demeanor of a witness in determining credibility. Cases do arise in which the demeanor of the witness is of utmost importance in determining credibility. It is, however, apparent that the legislature, in the

enactment of our workmen's compensation laws, intended to and did grant to the industrial commission broad powers in the process of determining whether an injured employee is entitled to compensation. If the commission believes that it is necessary for a proper determination of a case to observe the claimant or any other witness, it has ample power, on appeal, to order a further hearing or even to hear the matter over again *de novo*. Our review must be based on the record before us, and, in determining whether the evidence sustains the commission's findings of fact, it is the findings of the commission, not the referee, that are before us.

It may be said in passing that the granite company also relies upon N. L. R. B. v. James Thompson & Co. Inc. (2 Cir.) 208 F. (2d) 743. We see no object in attempting to reconcile or distinguish cases from foreign jurisdictions or the federal courts, where, as here, our statutes and decisions construing them clearly indicate what the law is in this state. There are decisions from other jurisdictions supporting our view,[4] and it may be that others could be found supporting the contention of the granite company. Unless they are shown to have been based upon similar statutes, however, they are of little value. We think that our decisions correctly construe our statutes.

Respondent is allowed $200 attorneys' fees together with his costs and disbursements.

Affirmed.

---

[4]See, for instance, Universal Camera Corp. v. N. L. R. B. 340 U. S. 474, 493 to 496, 71 S. Ct. 456, 467 to 469, 95 L. ed. 456, 470 to 471; 2 Larson, Workmen's Compensation Law, § 80.20; Sonny Boy's Fruit Co. v. Compton (Fla.) 46 So. (2d) 17; Douglas v. St. Joseph Lead Co. (Mo. App.) 231 S. W. (2d) 258.