Shirley MITCHELL, Relator,

v.

WHITE CASTLE SYSTEMS, INC., et al., Respondents.

No. 49365.

Supreme Court of Minnesota.

Jan. 11, 1980.

Rehearing Denied April 29, 1980.

Larry B. Leventhal, Minneapolis, for relator.

McEachron & McEachron and John A. McEachron, Jr., Bloomington, for respondents.

Heard before ROGOSHESKE, TODD, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Shirley Mitchell was struck by a customer at her place of employment and suffered a 10- to 20-percent permanent partial disability as a result of the traumatic neurosis she developed from the injury. She appeals from an order of the Workers' Compensation Court of Appeals, which affirmed the determination of the compensation judge that she had suffered no compensable permanent partial disability within the meaning and application of Minn.Stat. § 176.101, subd. 3(46) (1971). We affirm in part, reverse in part, and remand.

On or about September 11, 1972, Shirley Mitchell, age 35, was struck across the face by an unruly customer while she was working as a waitress at White Castle. Within the next few days she developed blurred vision, dizzy spells, pains in her left ear, humming in her head, numbness in her hands and feet, and she became so nervous and distracted that she began to forget orders and make mistakes in figuring customers' bills. Eventually, around June 19,

1973, she felt forced to quit White Castle because of her symptoms. She went into a deep depression, sitting at home staring into space, no longer interacting with her husband and children. Before the incident she had been a happy person. She had done well at her job at White Castle for 4 years, had missed few days of work during that time, and had, in fact, been offered a job as manager.

After the incident, Mrs. Mitchell saw a psychiatrist, Dr. Stephen Greenwald, and his psychiatric assistant, Carol Norgaard, for 2 years. On Dr. Greenwald's suggestion that she seek retraining so she could find a job she felt comfortable with, she went to the Division of Vocational Rehabilitation and took approximately 7 weeks of specific training in food service work at the Occupational Training Center in St. Paul. On November 12, 1976, she began working at Environmental Sanitation Services, a food service that serves both Hennepin County Medical Center and Metropolitan Medical Center. Her work consists of standing at a tray line and taking certain specified dishes off trays that come from patients who have already eaten. The job does not require her to interact with people. Her employment is reserved for people who have mental or emotional problems.

At the time of the hearing on September 8, 1977, Mrs. Mitchell was earning $3.30 an hour for a 30- to 35-hour week, or approximately $98 to $100 per week. At White Castle she had earned $2.45 an hour for a 40-hour week, or $94 a week.

Mrs. Mitchell continues to experience depression and numbness in her hands and feet. She takes Valium and other anti-anxiety medications prescribed by Dr. Greenwald. Dr. Greenwald, Mrs. Mitchell's treating physician, testified that she suffered a 20-percent permanent partial disability due to a traumatic neurosis. Dr. Robert Meller, the adverse physician, testified that she was 10-percent permanently disabled.

On November 27, 1974, a stipulation for settlement was executed by the parties and approved by the Workers' Compensation Division. Pursuant to this stipulation, Mrs. Mitchell was awarded 44 weeks of temporary total disability payments, for the period beginning June 19, 1973. She also received her medical expenses. In March 1977, Mrs. Mitchell filed a claim seeking additional temporary total disability payments for the period December 4, 1974 to November 12, 1976, retraining benefits, and 20-percent permanent partial disability. Compensation Judge Daniel Gallagher determined that Mrs. Mitchell sustained bruises and contusions to her face and developed a traumatic neurosis as a direct result of her personal injury at work. He found that she was temporarily disabled from June 19, 1973 to November 12, 1976, and therefore awarded 102.2 weeks of temporary total disability benefits for the period of November 28, 1974 to November 12, 1976. He also found that Mrs. Mitchell, currently employed as a kitchen helper "without ascertainable wage loss," had not sustained a provable permanent partial disability within the meaning and application of Minn. Stat. § 176.101, subd. 3(46) (1971), although she may have a permanent partial disability provable at some future date.

The Workers' Compensation Court of Appeals affirmed the findings of the compensation judge, though one member of the court was of the opinion that, as to the period after November 12, 1976, the matter should be remanded to the compensation judge to gather evidence as to Mrs. Mitchell's ability to earn, since one could infer from the evidence that she was earning more on a "tailored" job than might otherwise be possible. This appeal followed.

The appeal raises three issues:

(1) Is work-related psychological injury compensable as a case of "permanent partial disability not enumerated in this schedule" under Minn.Stat. § 176.101, subd. 3(46) (1971), where there is no organic injury?

(2) Did employee sustain a reduction in earning capacity within the meaning and application of Minn.Stat. § 176.101, subd. 3(46) (1971)?

(3) Is employee entitled to receive concurrent awards of temporary total and permanent partial disability benefits?

■ 1. Mrs. Mitchell's injury, caused by a blow to her head, occurred before "head" was included as a scheduled member, so compensation is sought under Minn.Stat. § 176.101, subd. 3(46),[1] now 176.101, subd. 3(49), which applies to "all cases of permanent partial disability not enumerated in this schedule * * *." The employer, citing no authority for the proposition, maintains that traumatic neurosis does not fit within this statutory section without a showing of both actual loss of earnings and, if a head injury, an organic injury. Although the compensation judge did not specifically find that Mrs. Mitchell's psychological disability fit within the statutory section, he stated that her injury was "probably" covered by the section. He did find that she may in the future be eligible for permanent partial disability benefits, an implicit finding that her psychological injury is compensable. This finding is consistent with several Minnesota cases which hold that psychological injury is compensable under the general bodily disability provision if it is the proximate result of the employee's injuries and results in disability. *Hartman v. Cold Spring Granite Co.,* 243 Minn. 264, 67 N.W.2d 656 (1954); *Soderquist v. McGough Bros.,* 210 Minn. 123, 297 N.W. 565 (1941); *Rystedt v. Minneapolis Moline Power Implement Co.,* 186 Minn. 185, 242 N.W. 623 (1932); *Welchlin v. Fairmont Railway Motors,* 180 Minn. 411, 230 N.W. 897 (1930). Mrs. Mitchell's psychological injury thus falls within the statutory section allowing permanent partial disability payments for unscheduled injuries, provided the other requirements of the section are met.

■ 2. To recover under Minn.Stat. § 176.101, subd. 3(46) (1971), the employee must prove a reduction in earning capacity. In the case of scheduled permanent partial disability, such a loss of earning capacity is conclusively presumed, regardless of the employee's ability to work at the same or greater earnings. *Boquist v. Dayton-Hudson Corp.,* 297 Minn. 14, 209 N.W.2d 783 (1973). In the case of an unscheduled injury, however, this court held in *Enrico v. Oliver Iron Mining Co.,* 199 Minn. 190, 271 N.W. 456 (1937), that it is the injured employee's ability to earn, not his actual earnings, that should be considered. *See Roberts v. Motor Cargo, Inc.,* 258 Minn. 425, 104 N.W.2d 546 (1960). Post-injury wages create a presumption of earning capacity and, when the facts of a case tend to show that they are a reliable measure of earning capacity, may alone be the basis of a denial of benefits. *Mathison v. Thermal Co., Inc.,* 308 Minn. 471, 243 N.W.2d 110 (1976). Since the presumption of earning capacity is rebuttable, it is necessary to determine whether Mrs. Mitchell's post-injury wages alone are a reliable indication that she has experienced no reduction in earning capacity due to her traumatic neurosis.

Mrs. Mitchell worked 40 hours a week for $2.45 an hour at White Castle in 1972. In 1976, she earned $3.30 an hour for approximately 30 hours a week at Enrivonmental Sanitation Services. Although she took home more money for fewer hours of work after the injury than before, the facts in this case call into question the reliability of using Mrs. Mitchell's wages at Environmental Sanitation Services as the sole measure of her earning capacity. First of all, at the time of the hearing she had not worked

1. At the time of Mrs. Mitchell's injury, Minn. Stat. § 176.101, subd. 3(46) read as follows:

   In all cases of permanent partial disability not enumerated in this schedule the compensation shall be 66⅔ percent of the difference between the daily wage of the worker at the time of the injury and the daily wage he is able to earn in his partially disabled condition, subject to a maximum of $73 per week, and continue during disability, not beyond 350 weeks; and if the employer does not furnish the worker with work which he can

do in his permanently partially disabled condition and he is unable to secure such work with another employer after a reasonably diligent effort, the commission may fix a rate of compensation to be paid to the worker during the period of his unemployment, not beyond 350 weeks, which is to be based upon the percentage of his general physical disability as determined from competent medical testimony adduced at a hearing before a compensation judge, a commissioner, or the commission.

there long, and she testified that she found her present job difficult and had been having trouble making herself go to work regularly. In fact, she had missed 10 or 15 days of work from November 1976 to September 1977. If she loses this job, the record is unclear as to whether she will be able to get another, especially one where she need not interact with other people. If she does get another job, the record does not indicate what her wages are likely to be. Her present job was specifically reserved for people who have mental or emotional problems. If she cannot perform this job, her ability to perform others at a comparable rate of pay may very well be different from most food service workers. Because there is evidence in the record which tends to impugn the reliability of using Mrs. Mitchell's post-injury earnings as the sole measure of earning capacity, and because the record contains little to help determine more closely what her earning capacity is, the case must be remanded for further findings as to earning capacity.

3. In the event the compensation judge on remand finds a compensable partial disability, the remaining issue as to whether Mrs. Mitchell is entitled to receive concurrent awards of temporary total and permanent partial disability benefits becomes important. Had Mrs. Mitchell's injury occurred after August 1974, this issue would be resolved by the amendment to Minn. Stat. § 176.021, subd. 3, which reads in relevant part:

> * * * Compensation for permanent partial disability is payable concurrently and in addition to compensation for temporary total disability and temporary partial disability as set forth in section 176.-101, subdivisions 1 and 2, * * * and such compensation for permanent partial disability shall not be deferred pending completion of payment for temporary disability or permanent total disability, * *. Permanent partial disability is payable for functional loss of use or impairment of function, permanent in nature, and payment therefore shall be separate, distinct, and in addition to payment for other compensation.

Laws 1974, ch. 486 § 1. However, since Mrs. Mitchell's injury occurred in 1972, the decision must be made according to pre-amendment law.

We held in *Pramschiefer v. Windom Hospital*, 297 Minn. 212, 211 N.W.2d 365 (1973), that an employee is entitled to benefits for both temporary total disability and permanent partial disability, but that permanent partial disability payments should await the cessation of payments for temporary total disability, unless the commission orders otherwise for good cause. *Pramschiefer* controls the instant case. Our recent decisions in *Tracy v. Streater/Litton Industries*, 283 N.W.2d 909 (Minn.1979), holding concurrent awards permissible, involved Minn.Stat. § 176.021, subd. 3, after the 1974 amendment.

Affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.