Thomas J. **FIELDING**, Respondent,

v.

**GEORGE A. HORMEL COMPANY,**
**Self–Insured, Relator,**

**Minnesota Department of Jobs and**
**Training, Intervenor.**

No. C2–88–2382.

Supreme Court of Minnesota.

May 5, 1989.

Michael Forde, Gilmore, Aafedt, Forde, Anderson & Gray, P.A., Minneapolis, for relator.

David Stofferahn, Sieben, Gross, Von Holtum, Carey & McCoy, Ltd., Minneapolis, for respondent.

WAHL, Justice.

This is an appeal from a decision of the Workers' Compensation Court of Appeals reversing a compensation judge's denial of wage loss benefits to a disabled employee

whose employment relationship was disrupted by a union strike. We reverse in part, affirm in part, and remand for further proceedings.

In 1980, Thomas J. Fielding sustained a *Gillette*-type injury [1] to both arms, diagnosed as ulnar neuritis, resulting in a 20% permanent partial disability to the right arm and a 10% permanent partial disability to the left arm. Hormel accepted liability and paid workers' compensation benefits. A short time after his injury, the employee returned to work in a light-duty capacity. Sometime in 1981, the employee was assigned the position of quality control clerk in the shipping department. This position required the employee to visually inspect vacuum packaged products. The employee was able to physically tolerate this job; and he performed the duties of quality control clerk for 4 years without any wage loss.

On August 17, 1985, the Local P-9 of employee's union called for a strike against Hormel; and the employee stopped working. The next day, August 18, 1985, the employee filed a claim for unemployment compensation and began looking for work.[2]

By letter dated January 4, 1986, Hormel informed striking employees that the plant would be re-opening on January 13, 1986, and that work would be made available for those who wanted to return to work. The letter instructed the striking employees to report for work at the plant on January 13, 1986. By letter dated January 7, 1986, Hormel informed striking employees that a "hot-line" had been established for those who had any questions about returning to work at Hormel. The employee received both letters.

The employee did not use the hot-line and he did not report to work on January 13, 1986. Instead, the employee sent a form letter dated January 13, 1986, to the workers' compensation administrator for Hormel. The letter requested information as to the type of job that would be available to him. The employee received no response to his January 13, 1986, letter.

The employee continued to look for work after January 13, 1986. He found three part-time jobs during February 1987–June 1987. In August 1987, the employee found part-time work with the postal service. The employee felt this job would eventually be full time.

The employee filed a claim for temporary total/temporary partial disability benefits following the commencement of the strike in August 1985. The matter came on for hearing before a compensation judge on September 25, 1987. The employee testified that the primary reason for his failure to report for work with Hormel in January 1986 was that he had received no response to his January 13, 1986, letter to Hormel's workers' compensation administrator. He also admitted that his reluctance to cross the picket line could have played a part in his decision. Hormel's workers' compensation administrator testified that he received about 30 form letters like the one sent by the employee. He saw no need to respond because the employee held a job for 4 years prior to the strike. Hormel's workers' compensation administrator also testified that approximately 467 striking workers returned to work, that 44 of the employees who returned to work had disabilities, and that Hormel provided work to all 467 employees who returned to work and provided work within the physical limitations of the 44 employees who had disabilities. The workers' compensation administrator acknowledged that since the strike, Hormel did make specific written job offers to disabled workers who had been receiving compensation benefits at the time of the strike.

The compensation judge found that the employee conducted a diligent job search after going out on strike in August 1985. She denied the employee's claim for benefits, however, finding that the employee's decreased earning capacity was not due to his disability but rather due to his strike activity and failure to report to work in January 1986. On appeal, the Workers' Compensation Court of Appeals reversed concluding that strike activity did not pre-

1. *Gillette v. Harold, Inc.,* 257 Minn. 313, 101 N.W.2d 200 (1960).

2. He did not receive unemployment benefits until June 1986.

clude receipt of benefits where the employee had made a diligent work search and that the general recall letter did not constitute a good faith offer of employment that the employee could do within his physical limitations.

1. The first issue necessarily raised by this appeal concerns the effect of a union strike on a disabled workers' entitlement to wage loss benefits at the initiation of the strike. As a general rule, an injured employee may receive temporary partial benefits for a reduction in earning capacity that is causally related to the disability. *Morehouse v. Geo. A. Hormel & Co.*, 313 N.W.2d 8 (Minn.1981); *Dorn v. A.J. Chromy Const. Co.*, 310 Minn. 42, 245 N.W.2d 451, 454 (1976). Voluntary termination of employment and a discharge for misconduct do not preclude a claim for benefits upon proof of a wage loss attributable to the disability. *Johnson v. State, Dept. of Veterans Affairs*, 400 N.W.2d 729 (Minn.1987); *Kurowski v. Kittson Memorial Hospital*, 396 N.W.2d 827 (Minn.1986). *Accord, Marsolek v. Geo. A. Hormel Company*, 438 N.W.2d 922 (Minn.1989). We believe that a disruption of the employment by way of a union strike should not place a disabled employee "in a worse position than a discharge for misconduct." *Johnson*, 400 N.W.2d at 732. We therefore hold that if an injured employee voluntarily goes out on strike, this provides grounds for the suspension of benefits; but the suspension of benefits will be lifted once it has become demonstrable that the disability due to the work injury is the cause of the employee's inability to find work elsewhere. *See generally*, 2 A. Larson, *The Law of Workmen's Compensation* § 57.64(c) (1987) and (Supp.1988).

In the employee Fielding's case, Hormel argues that the compensation judge's findings relative to the cause of the

wage loss had substantial evidentiary support; and Fielding counters that the issue was not litigated before the compensation judge. While we note that this case arose out of a claim for benefits and that it was the employee's obligation to establish that claim, we agree that in this case the issue as to the employee's entitlement to benefits after the commencement of the strike had not been properly framed and argued before the compensation judge; and that an affirmance of a compensation judge's findings under these circumstances would not be fair. Accordingly, we vacate the Workers' Compensation Court of Appeals award of temporary partial benefits at the temporary total rate and remand the matter to the compensation judge for relitigation. *See Kulenkamp v. Timesavers, Inc.*, 420 N.W.2d 891 (Minn.1988).[3] The award of temporary partial benefits based on actual wages is affirmed. *Mitchell v. White Castle Systems, Inc.*, 290 N.W.2d 753 (Minn. 1980).

2. The other issue raised by this appeal concerns the effect of the general recall letter which had been sent to all of the striking employees, stating in relevant part:

> We will process the return to work forms and put returning employees to work immediately on the jobs that are available during start-up operations.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> We are merely stating that a job is available to you depending upon the positions that are open as the plant resumes production. We will make every effort to accommodate as many returning employees as possible.

The workers' compensation court of appeals determined that the general recall letter was insufficient to amount to a valid offer of work for purposes of defending a claim for benefits.

---

**3.** Apparently in relying on *Johnson, supra,* the Workers' Compensation Court of Appeals concluded that the employee in this case was entitled to benefits after going out on strike and beginning a diligent search for work elsewhere the very next day. We do not read *Johnson* quite so broadly. Factual differences aside, in *Johnson* the claimant provided medical and vo-

cational evidence in support of her claim. While we recognize that in many contexts a diligent search for work to no avail may serve as sufficient evidence of a causal relationship between a period of unemployment and a disability, in the context of the Hormel strike in this case, we agree with the compensation judge that more was required.

In *Johnson, supra* at 732, we stressed that "[a]bsent a genuine and unequivocal offer of work that the employee can do in his or her physical condition, the employee cannot be said to have refused an offer of suitable employment * * *." In our view, the general recall letter, while extending an offer of re-employment, contained no assurances to disabled employees of placement in light-duty jobs on their return; and as such, did not operate as an effective offer of employment to disabled employees so as to suspend benefits upon a failure to respond.

Hormel argues that the general recall letter must be evaluated in light of the strike situation and implies that it was not possible to make specific job offers to disabled employees. As the employee counters, however, Hormel did make specific written job offers to other disabled employees. Hormel also refers to evidence that disabled workers who did return received work within his or her work restrictions; but as the Workers' Compensation Court of Appeals concluded, such evidence was not relevant. *Koenig v. Northern Insulation Co.*, 358 N.W.2d 644 (Minn.1984).

As the separate concurrence in this case demonstrates, we are not of one mind as to the rationale for rejecting Hormel's claim of a valid work offer in this case. While the concurring members of this court believe that the general recall letter should be deemed a sufficient valid work offer to at least trigger an inquiry from disabled employees, the employee in this case did make inquiry. The employer ignored the employee's inquiry. Thus, it cannot be said that under the facts in this case that the employer made an unequivocal offer of suitable work which the employee refused. Accordingly, the Workers' Compensation Court of Appeals' decision as to the effect of the general recall letter in this case is affirmed.

Reversed in part, affirmed in part and remanded.

The employee is awarded $400 in attorney fees on appeal.

KELLEY, J., took no part in the consideration or decision of this case.

COYNE, Justice (concurring specially).

Although I concur with the conclusion that the employee did not refuse an unequivocal offer of suitable employment, I am of the opinion that Hormel's letter of January 4, 1986 amounted to a bona fide offer of employment, which required some response on the employee's part. It is Hormel's failure to reply to the employee's inquiry about the nature of the job offered, not the failure of the original offer, which justifies the imposition of liability for compensation benefits in the event the employee's disability curtailed his ability to secure employment.

For several years prior to the strike which began on August 17, 1985, Hormel had designated certain light duty jobs for assignment to injured workers by a rehabilitation committee composed of union and management representatives. For more than four years, from April 1980 to August 17, 1985, employee was assigned to various light duty or rehabilitation jobs without any wage loss. The compensation judge found as fact that on August 17, 1985 employee voluntarily stopped working and went on strike with his fellow employees. The employee was not then receiving any treatment for his work-related injury; neither was he experiencing any symptoms related to that injury.

The strike had been in progress about four and one-half months when the employer notified employee and the other striking employees by the letter of January 4, 1986, that the plant would reopen on January 13, 1986, and that all employees could return to work. The opening paragraph advises the employee that the plant is to be re-opened:

On January 13, 1986, your Company will open up the Austin Plant. The strike by Local P–9 has now dragged on for over 20 weeks. The time has come to reopen the plant and make work available for those who want to work. The decision to reopen the plant was a difficult one. It was made in light of the recent Mediator's and International Union's unsuccessful attempts to resolve the labor dispute in Austin. * * * *

The second paragraph, quoted only in part in the majority opinion, described the procedure by which employees would be returned to work:

> Many employees have asked us what procedure will be followed when we reopen the plant. The procedure is this. Simply, return the enclosed form to the Company in the self-addressed envelope that is enclosed for your convenience. Please do this as soon as possible and report for work at the plant on January 13, 1986. We will process the return to work forms and put returning employees to work immediately on the jobs that are available during start-up operations. The decision to strike was yours, and the decision to return to work is also yours, and yours alone. The Company is not telling you what to do in that regard. We are merely stating that a job is available to you depending upon the positions that are open as the plant resumes production. We will make every effort to accommodate as many returning employees as possible.

The letter closed with these words:

> As we have said many times, the Austin Plant was not built to set [sic] idle. We are committed to running this plant. We want you to be a part of that operation.

It seems to me that by this letter the employer has communicated to any reasonable reader a good faith offer to resume employment. That the letter is nonspecific about particular job openings, their number, and the exact dates on which particular positions will be available casts no doubt on the bona fides of the job offer; it merely reflects the circumstances in which the letter was written. The labor dispute which had precipitated the closing of the plant had not yet been resolved. The employer did not know how many employees would accept the offer to resume employment nor what skills and experience the returning workers would possess. Neither could Hormel anticipate how many partially disabled employees would return to work or the nature of the returnees' disabilities. Because of many inquiries regarding the recall, a second letter, dated January 7, 1986, advised employees of a hotline for questions regarding recall procedures and union status. Given the existence of the strike, the fact that the partially disabled employees had ceased working for reasons unrelated to their injuries, and Hormel's track record with respect to the placement of injured workers—all undisputed facts— the compensation judge's finding of fact that the employer's letter informed the striking employees that the employer would find work for employees who returned on January 13, 1986, is in my opinion unassailable. Accordingly, I would hold that the January 4th letter communicated a good faith offer of employment and would hold any employee who is partially disabled as a result of a compensable injury to an obligation not unlike that required of any able-bodied worker: that the employee respond to the employer's offer by signifying a willingness to return to work whenever a suitable job is available.

Relying on *Johnson v. State Department of Veterans Affairs*, 400 N.W.2d 729 (Minn.1987), the majority, like the WCCA, confines its analysis to the January 4th letter itself and declares that a general letter recalling employees to work does not amount to a valid job offer to which a disabled employee was obliged to respond. Certainly, the letter does not offer Thomas Fielding, or any other employee, a specific job tailored to meet his physical limitations, his particular skills, or his other qualifications. But no letter is written or read in a vacuum, as the *Johnson* case aptly illustrates. Following a work-related back injury, employee Johnson was placed on a modified job status as a nurse's aide. Johnson quit after an argument with her supervisor over the assignment of an additional task. Later the employee wrote to the employer requesting that she be permitted to return to work in a light duty capacity that would accommodate her back disability. By letter the employer replied that if Johnson wished to be considered for employment again, she should request that her name be placed on the reemployment list for the position of nurse's aide. The employer conceded that the letter was not even intended as an offer of employment, much less an offer of work the employee could do in her partially disabled condition. *Id.* at 731.

The fact which distinguishes the present case from *Johnson* and justifies the imposition of a duty to respond in the one case and not in the other is a fact extraneous to the letter itself: the identity of the initiator of the dialogue. While the employee had in both cases voluntarily left the job, employee Johnson had asked to return to work at a job she could do. The employer did not respond with a genuine and unequivocal offer of suitable work, so the employee had no obligation to accept a non-offer. The Hormel letter, on the other hand, advised striking employees that, despite the on-going labor dispute, it was making work available to those who wished to return to work. That the letter was a bona fide offer of employment requiring response is borne out by the fact that all employees who reported were put to work—including the 44 partially disabled employees who were given light duty jobs.

Moreover, the employee himself recognized both the bona fides of the offer and the necessity of a response, for he asked what job within his restrictions was available to him. The employer did not answer. Regardless of the ambivalence and the unenthusiastic tenor of the employee's inquiry, if the employer wanted to shield itself from the obligation to pay disability compensation on the ground that the injured worker refused an offer of suitable employment, the employer was then obliged to make a genuine and unequivocal offer of work the employee could do in his physical condition. *Johnson,* 400 N.W.2d at 732. It is the failure to reply to employee's inquiry, not the generality of the recall letter, which causes me to concur in the result.

SIMONETT, Justice (concurring).

I join in the special concurring opinion of Justice Coyne.

KEITH, Justice (concurring).

I join in the special concurring opinion of Justice Coyne.