305 P.2d 443

Bernadette A. MARUM, Widow, William Hamilton Marum, Jr., Elizabeth Ann Marum, and Jeanne Frances Marum, Minor Children, Petitioners,

v.

The INDUSTRIAL COMMISSION of Arizona and San Manuel Copper Corporation, Defendant-Employer, Respondents.

No. 6259.

Supreme Court of Arizona.

Dec. 29, 1956.

Darrow & D'Antonio and Burt Haberman, Tucson, H. S. McCluskey, Phoenix, for petitioners.

John R. Franks, Phoenix, for respondent Industrial Commission. Robert K. Park, Donald J. Morgan and John F. Mills, Phoenix, of counsel.

Guynn & Twitty, Phoenix for respondent employer.

PHELPS, Justice.

Petitioners, as dependents of decedent William H. Marum, seek by certiorari to set aside an award of the Industrial Commission bearing date March 8, 1956, awarding petitioners death benefits based upon the guaranteed average monthly wage of decedent who had theretofore been killed by an accident arising out of and in the course of his employment with the San Manuel Copper Corporation. The employer will be hereinafter designated as the Company, the Industrial Commission as

the Commission, and the applicants as petitioners, and Marum as decedent. ·

The facts are that decedent was, and had been for a period of approximately 18 months, employed by the Company. At the time of his employment he was informed by the person authorized to hire such labor, the amount of the daily wage paid miners by the company; that they would be paid on the basis of a six-day week; that the company was working seven days and that he would receive time and one-half per hour for over 40 hours per week; that he would receive 32 cents per shift differential for working shifts other than the day shift and that there were fringe benefits, such as group insurance and vacation plan then in effect. That was all. Decedent accepted employment and went to work on those terms.

He was subsequently assigned to a crew to sink a shaft in the development process of the mine. There were then three shafts being sunk. To each shaft there was assigned three crews of six men each including five shaft men and one leader. Each crew worked eight hours per day. Each shift had to carry seven men however, so that each man could take a different day off each week. At the time decedent was injured shaft men received a guaranteed wage of $16.92 per day and lead men $18.52 per day. Decedent worked as a lead man. All shaft men, including lead men, worked under a special contract providing for payment to the crew of a specified sum for each foot of shaft sunk. Any sums earned by them under such contract above their guaranteed wage per day was paid to them as a bonus. In the event the power failed or something occurred preventing the men from working, if only for a short time, such lost time was not charged against the contract and the employee received his guaranteed daily wage. In the event they were unable to sink the shaft a sufficient depth during the week, which at the scheduled pay fixed for such work, would not equal the total guaranteed wage of the crew, each member of the crew nevertheless would receive the full amount of the guaranteed daily wages for the week. They were never paid less than the daily wages whether they were working under a contract or not. These wages were posted on all bulletin boards for different job classifications and were kept current with any changes that may have been made.

Measurements of the shaft were made each Sunday morning at 8 a. m. by measuring from the collar of the shaft to the bottom and the advanced depth was ascertained by deducting the depth shown by the previous measurements from the last measurement made. The bonus was then determined by computing the aggregate earnings of the crew under the contract price per foot of the various different items

involved (which are too numerous to mention). Then the aggregate of the guaranteed wages earned by the crew for the work done was ascertained and a balance was struck between the two amounts. If the contract price exceeded the guaranteed wages due the crew for the number of feet the shaft had been sunk, the difference would constitute the bonus to be paid the crew. The bonus was then divided among them in accordance with the wages guaranteed for the respective kind of work performed and the number of days worked by each. If the contract price for sinking the shaft was less than the aggregate guaranteed wages due the crew for said work they, nevertheless, were each paid the full amount of their guaranteed wages for the week.

The Commission based its award upon a finding by it that the average monthly wage of decedent was $503.77. This finding was based upon the guaranteed wages of decedent. Petitioners claim that the average monthly wages of decedent should be arrived at by allowing decedent the guaranteed wages of $503.77 per month, plus the amount of the bonus earnings over and above the guaranteed wage. They urge that, based upon this formula, decedent's average monthly wage was approximately $1,000 per month and that it is that amount the Commission should have used as a basis for its award.

Petitioners have assigned a number of errors but when boiled down to their last analysis they raise only one issue: Did the Commission use the correct wage base for computing the compensation due petitioners or should it have used the higher amount claimed by them? The answer to the question is found in the language of the last nine lines of Section 56–952, A.C.A. 1939 (now 23–1041, subd. C, A.R.S.1956), which reads as follows:

"* * * If the employee is working under a contract by which he is guaranteed an amount per diem or per month, notwithstanding the contract price for such labor, then said employee or his subordinates or employees working under the terms of such contract, or his or their dependents in case of death, shall be entitled to receive compensation on the basis only of the guaranteed wage as set out in said contract of employment, whether paid on a per diem or a monthly basis, but in no event shall the basis be less than the wages paid to employees for similar work not under contract."

We have had the identical portion of this statute before us on at least three occasions, first, in the case of Kennecott Copper Corp. v. Industrial Comm. (Jaime case), 61 Ariz. 387, 149 P.2d 687, 688, in which the facts are identical in principle with the facts in this case, in that the claim-

ant (Jaime) was employed at $6.40 per day and additional compensation, under a special contract, based upon the amount of work completed in any one week. But under no circumstances was he to receive less than the guaranteed wage of $6.40 per day. Jaime had the privilege of employing such persons as were necessary in the performance of his work and received time and one-half for over time in excess of a 40-hour week. This court said in that case:

"* * * The language of the statute and more particularly that of the fourth sentence of section 56–952 [identical with the above quote] is to this Court clear, unambiguous and unequivocal and cannot be disregarded. [Citing cases.]

"There can be no question that there existed a contract of employment between applicant and petitioner, that there was a guaranteed wage and in view of the language of the statute, 'shall be entitled to receive compensation on the basis only of the guaranteed wage as set out in said contract of employment', it is our view that only one conclusion can be drawn, that the Commission erred in using the additional monies paid to applicant over and above his guaranteed wage as part of the basis for the award."

Again in Miami Copper Co. v. Schoonover, 65 Ariz. 239, 178 P.2d 554, we construed the same language. Schoonover was employed by the Copper Company at a base wage of $6.82 per day. He thereafter agreed to perform specified work and labor for a certain contract price. If his production under his special agreement fell below standard, i. e., would not equal his guaranteed wage of $6.82 per day, he nevertheless was to receive the guaranteed wage. During the thirty days immediately preceding his injury he earned a total of $356.35, of which $180.73 represented the guaranteed base wage, and $175.60 represented the special contract earnings in excess of the guaranteed wage. Schoonover suffered temporary total disability as a result of his injury, for a period of thirty-five days. The Commission awarded compensation based upon his entire earnings for the thirty days immediately preceding his injury basing its ruling, in part at least, upon Barron v. Ambort, 64 Ariz. 209, 167 P.2d 925.

We pointed out in the Schoonover case, however, that the facts were easily distinguishable from the Barron v. Ambort case for the reason that in the latter case there was no guaranteed wage payable "notwithstanding the contract price". [65 Ariz. 239, 178 P.2d 555.]

It was clear to the author of the Barron opinion and to the court, as it is to us, that

the contract in that case, guaranteeing a wage of $75 per month plus 4% commission for distribution of milk for a dairy, must be construed to mean that the employer and employee both intended that it was the combination of the $75 per month plus the commission of 4% on all milk distributed, that constituted the monthly wage of the employee and the guarantee went to the whole amount and not merely to the $75. As was said in the Schoonover case the last sentence of section 56–952, A.C.A. 1939 (now section 23–1041, subd. C, A.R.S. 1956) had no application to the facts in Barron v. Ambort, supra, for the reason that the contract earnings and the guaranteed wages were identical and that therefore the entire earnings of the employee must be used as a basis for compensation.

It is argued that in the instant case there is no evidence of a guaranteed wage to employees engaged in the sinking of shafts including the leader of the crew, for the reason that it was not shown what wages employees, doing similar work not under contract, were receiving. We cannot agree with this assertion. The evidence is replete with statements of witnesses that the guaranteed wage of decedent was $18.52 per day and that the leader of mine shaft crews would be paid that wage regardless of whether their contract price per foot for sinking the shaft amounted to that much. In fact, counsel stipulated that shaft men were paid the sum of $16.92 and shaft crew leaders were paid $18.52 per day. This was the wage guaranteed to decedent in any eventuality. Mr. Buchanan, Assistant General Manager of Operations, Magma Copper Company and San Manuel Copper Corporation, testified that employees doing the same kind of work as decedent, received a guaranteed wage in the same amount whether under contract or not.

It was shown what proportion of decedent's earnings were guaranteed; the amount of the bonus paid and the aggregate of the two; and it is also established that the guaranteed wages and the contract earnings are entirely different. This clearly differentiates the instant case from Barron v. Ambort and places it in harmony with both Kennecott Copper Corp. v. Industrial Comm. and Miami Copper Co. v. Schoonover, supra.

The award of the Commission is therefore affirmed.

LA PRADE, C. J., and UDALL, WINDES and STRUCKMEYER, JJ., concur.