587 P.2d 757

**Grady L. FLETCHER, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Phelps Dodge Corporation, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

No. 1 CA–IC 1637.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 15, 1978.

Rehearing Denied Oct. 5, 1978.

Review Denied Dec. 5, 1978.

Davis, Eppstein & Tretschok, P. C., by Robert W. Eppstein, Bruce L. Dusenberry, Tucson, for petitioner.

John H. Budd, Jr., Chief Counsel, The Industrial Commission of Ariz., Phoenix, for respondent.

Evans, Kitchel & Jenckes, P. C., by James G. Speer, Phoenix, for respondent employer.

Robert K. Park, Chief Counsel, State Compensation Fund, Phoenix, for respondent carrier.

## OPINION

SCHROEDER, Judge.

The petitioner, Grady Fletcher, suffered an industrial injury in March, 1970, while employed as an underground miner for the respondent-employer, Phelps Dodge Corporation, in its Bisbee, Arizona, mine, the Copper Queen. He returned to light work approximately one year later as a mine watchman at a reduced wage rate. The Industrial Commission found that he had suffered a 30% general physical functional disability, and awarded him permanent benefits based upon a 34.81% reduction in his monthly earning capacity.[1]

Petitioner continued working for Phelps Dodge as a watchman until June, 1975, when Phelps Dodge ceased mining operations at the Copper Queen Mine. The petitioner was laid off along with the other mine employees. Since the Copper Queen Mine represented the principal industry of Bisbee, the closure of the mine was economically catastrophic to the area. Petitioner did not find new employment.

Shortly after the mine's closure, petitioner filed a petition for rearrangement or readjustment pursuant to A.R.S. § 23–1044(F)(2), claiming that he was entitled to a finding of total loss of earning capacity. At the time of the hearing on that petition, the Commission also considered petitioner's claim that the Industrial Commission had erred in computing his average monthly wage as an underground miner by failing to take into account certain contract bonuses he had received prior to his injury.[2]

The hearing officer entered findings and award, affirmed on review, holding against the petitioner on both questions. In this special action we are, therefore, called upon to consider two different issues. The first is whether the petitioner demonstrated entitlement to increased compensation based on a greater loss of earning capacity following the closure of the mine. The second is whether, in light of the applicable statute, A.R.S. § 23–1041(C), and case law, the Commission erred in excluding contract bonuses as part of petitioner's average monthly wage prior to his injury.

### Loss of Earning Capacity

Petitioner lost his job at the Copper Queen because the entire mine shut down. He admittedly has an industrial disability, and after the mine's closure was unable to find employment. His claim for an increase in compensation benefits was denied below on a finding that his present unemployment is attributable to economic factors and not to his injury.

---

1. This amount was determined by comparing his average monthly wage of $802.98 which he had received as a miner with his monthly wage of $523.40 which he was then receiving as a watchman.

2. The Commission's "notice of average monthly wage" being protested in these proceedings was issued over five years after the industrial accident. This was because of an irregularity in the original notice. Petitioner timely protested the second notice and the question was before the Industrial Commission at the same time as petitioner's rearrangement petition.

The essential question before us is whether the petitioner has shown an adequate causal link between his present inability to find a job and his underlying industrial injury in the face of the extreme economic adversity facing all workers in the area at the time his claim was made. As Professor Larson has trenchantly stated,

"[t]he economic-physical causation problem in its most elementary but most awkward form is presented when a physically handicapped worker is laid off or is unable to get a job during a period of falling employment, at a time when he might or might not have been able to get and keep a job if physically sound." 2 Larson, The Law of Workmen's Compensation § 57.63, at 10–147 (1976).

In considering this problem, we must be guided by a basic principle of workmen's compensation law: the law should compensate for losses attributable to industrial injuries, but not for losses attributable to other factors. *See e. g., Reilly v. Industrial Comm'n*, 1 Ariz.App. 12, 398 P.2d 920 (1965); A.R.S. § 23–1021(A). This principle is reflected in Arizona cases dealing with the effect of economic upswings or downswings upon compensation. Those cases uniformly follow the policy enunciated in *Whyte v. Industrial Comm'n*, 71 Ariz. 338, 227 P.2d 230 (1951), that

"a reduction or increase in earning capacity occasioned by general business conditions and not due to the injury cannot be considered by the commission as a basis for fixing or adjusting the compensation of an injured employee." *Id.* at 346, 227 P.2d at 235.

See *Altamirano v. Industrial Comm'n*, 22 Ariz.App. 379, 527 P.2d 1096 (1974); *Arizona Public Service Co. v. Industrial Comm'n*, 16 Ariz.App. 274, 492 P.2d 1212 (1972).

The requirement of demonstrating a causal connection between an injury and a subsequent loss in earnings is also contained in the language of the statute under which petitioner seeks to augment his compensation. A.R.S. § 23–1044(F)(2) provides that compensation for an injury may be readjusted upwards, even if there is no change in the physical condition of the employee, but only when the loss of earning capacity is one "arising out of such injury."

In *Schnatzmeyer v. Industrial Comm'n*, 77 Ariz. 266, 270 P.2d 794 (1954), the Court was presented with the problem of an injured employee who was experiencing difficulty in finding employment in a period of economic decline. The Court clearly held that the task of the Commission was to determine the extent to which the injury, as opposed to other factors, prevented reemployment. The Court rejected the standard, previously enunciated in *Matlock v. Industrial Comm'n*, 70 Ariz. 25, 215 P.2d 612 (1950), that the employee's earning capacity in such a situation should be based upon the wages which the employee would earn assuming he could obtain a job which he could physically perform. In repudiating that test, the Court recognized that in the real world disabled employees may have considerable difficulty in finding employment which they physically are able to perform. It quoted with approval language in the early case of *Ossic v. Verde Central Mines*, 46 Ariz. 176, 49 P.2d 396 (1935), that the Commission

" 'should consider not only the actual impairment of the physical and mental capacity of the injured person to do work, but whether and *to what extent* his injury is likely to deprive him of the ability to secure the work which he might do if he were permitted to attempt it.' " 77 Ariz. at 270, 270 P.2d at 797.

In this case the petitioner lost his job because of economic circumstances and now seeks increased benefits due to his inability to find other suitable work. While this situation has not frequently been presented in Arizona, it has arisen frequently in other jurisdictions. The standard applied in virtually all of the cases which have come to our attention is that when a claimant loses employment as a direct result of economic or other reasons unrelated to his injury, he may nevertheless be entitled to compensation if he is able to show that the difficulties in finding other employment are due to his injury. One New York court stated the rule as follows:

"Although the immediate cause of claimant's loss of his most recent employment was a reduction in work force owing to economic conditions, claimant would still be entitled to compensation if his back condition was a limiting factor in his search for employment, and, therefore, partly responsible for his inability to find other employment." *Boyle v. Gatti*, 40 App.Div.2d 1063, 1063, 339 N.Y.S.2d 65, 66 (1972).

The Supreme Judicial Court of Massachusetts, in an early case, has stated the guideline as follows:

"[I]f his [injury] prevented his pursuing his former employment, or if by reason of business conditions he could not secure work at this occupation and his ability to labor in other pursuits was impaired by his injuries, this circumstance was important in determining the amount of wages he could earn and should be taken into account in deciding what compensation should be awarded him because of his diminished capacity to work." *Capone's Case*, 239 Mass. 331, 333, 132 N.E. 32, 33 (1921).

■ Thus, the result in a given case depends largely upon whether there has been an adequate factual showing that, following a non-work related termination, the industrial disability actually interfered with the worker's ability to obtain work. In some cases, the applicant has been successful. *E. g., Biscardi's Case*, 284 Mass. 14, 187 N.E. 92 (1933); *Johnson's Case*, 242 Mass. 489, 136 N.E. 563 (1922); *Calogero v. State Insurance Fund*, 53 A.D.2d 726, 384 N.Y.S.2d 50 (1976). In other cases, compensation benefits have been denied because of an inadequate factual showing. *E. g., Driscoll's Case*, 243 Mass. 236, 137 N.E. 260 (1922); *Winber v. Gottlieb Adorn Printing Co.*, 19 A.D.2d 913, 244 N.Y.S.2d 39 (1963); *Mazurkiewicz v. Maritime Milling Co., Inc.*, 18 A.D.2d 740, 235 N.Y.S.2d 426 (1962).

The most relevant Arizona case of which we are aware is *Whitlock v. Industrial Comm'n*, 19 Ariz.App. 326, 507 P.2d 128 (1973). As in the other cases cited, the Court viewed the issue to be whether the applicant had shown that his inability to find work was attributable to the disability. The Court held that the evidence supported the Commission's finding that his problems were due solely to economic conditions and not to his industrial disability.

■ Given the facts of the instant case, we hold that the award of the Commission denying a rearrangement must be affirmed. Petitioner undisputably was disabled as a result of an industrial injury, and returned to light work in a job paying lower wages. However, he received an award representing a 34.81% diminished earning capacity. The record reflects that when the mine closed he made only limited efforts in seeking reemployment. There is no evidence that he was ever refused a job on account of his disability. While we assume that his injury prevents him from doing heavy work, he is already receiving compensation for that 34.81% loss of earning capacity. His burden in this proceeding, in which he claimed a total loss of earning capacity attributable to his injury, was to present evidence that his disability should now be considered as limiting his earning capacity even more. This he has failed to do.

We recognize that in adopting a standard which would permit the possibility of an award for compensation following a general economic layoff, *Oquita v. Industrial Comm'n*, 120 Ariz. 610, 587 P.2d 1187 (App.1978), filed this day, we are rejecting the threshold position of the carrier. Its position is that benefits following a general layoff can never be allowed, because the economic motivation for the layoff is in and of itself dispositive. Language in Professor Larson's treatise suggests this as a possible rule.[3] We conclude, however, that

---

3. In speaking of the "economic-physical" causation problems presented when an industrially disabled worker is laid off during a period of falling employment, Larson states in part:

"It is not difficult to phrase a plausible rule: Loss of employment should not be deemed due to disability if a worker without the disability would lose employment or suffer a

such a rule is neither supported by case law nor consistent with the policy enunciated in *Schnatzmeyer v. Industrial Comm'n*, that a workman should be compensated, if because of his injury, he is less able to obtain work which he could have otherwise performed. We also reject the extreme position suggested by petitioner that a prior disability coupled with subsequent unemployment automatically entitles him to total benefits.

Petitioner principally focuses upon the testimony of Thomas L. Fisher, Ph.D., who conducted a survey of the 1970–1976 Bisbee-Douglas labor market with respect to the availability of light work. His study showed that, excluding the positions available at the mine prior to its closure, there were very few light work positions available in the Bisbee area. We understand petitioner's argument to be that, because of this, he should now be considered "unemployable" for the entire period following his injury, and that he is therefore entitled to seek total compensation benefits. This argument, however, wholly ignores the facts that petitioner was employed at the mine following his injury and that, before its closure, the mine was an element of the total Bisbee job market. Other evidence in this record establishes that the mine's shutdown eliminated the only source of relatively high wages in Bisbee and that all workmen, whether disabled or not, could expect to earn less money in the market as it existed at the time of this hearing.

The petitioner, relying on *Schnatzmeyer v. Industrial Comm'n*, also argues that even though he failed to show that his total loss of earnings are attributable to his physical condition, the Commission nevertheless should have made specific findings determining the extent to which his unemployment was caused by his injury. Petitioner's argument would have merit if there was some evidence to support a finding that the

reduction in earnings under the same economic conditions—but whether this formula can be applied with any precision may be open to question.

If the impaired worker becomes unemployed as a result of a general layoff at the completion of a project or closing of a plant, the suggested formula would not support a

petitioner's inability to find light work following the mine closure was to some extent affected by his disability. However, there was no such evidence.

The award of the Industrial Commission with respect to loss of earning capacity and the denial of petitioner's petition for rearrangement must be affirmed.

### Average Monthly Wage

■ Petitioner's present benefits have been computed on the basis of an average monthly wage of $802.98. This amount was based upon the guaranteed union wage in effect at the time of petitioner's injury in 1971. Petitioner's position is that this amount improperly fails to take into account certain bonus payments which he regularly received prior to his injury. The payments were made pursuant to a special contract providing that miners doing certain types of work on specified jobs would be paid additional incentive amounts if certain productivity levels were obtained. Under the special contract, the employees were guaranteed the regular rate in the event that the bonus payments were not earned. We accept, for purposes of this review, petitioner's factual assertions that similar bonus payments were available to virtually all underground miners working for Phelps Dodge, and that the levels of productivity required for receipt of them were normally but not always met.

The question before us concerns the applicability of A.R.S. § 23–1041(C) and the cases interpreting that provision. A.R.S. § 23–1041(C) provides:

"If the employee is working under a contract by which he is guaranteed an amount per diem or per month, notwithstanding the contract price for such labor, the employee or his subordinates or employees working under the terms of such contract or his or their dependents in case

finding of compensable disability. Indeed, it has been held that this rule applies even when there is evidence that the injured worker is at a disadvantage finding a new job after the layoff." 2 Larson, The Law of Workmen's Compensation § 57.63 at 10–147–48 (1976) (footnotes omitted).

of death, shall be entitled to receive compensation on the basis only of the guaranteed wage as set out in the contract of employment, whether paid on a per diem or monthly basis, but in no event shall the basis be less than the wages paid to employees for similar work not under contract."

Applying that statute, the hearing officer concluded that petitioner was not entitled to have the bonus contract payments considered as a part of his monthly wage, and that his average monthly wage should be based on the guaranteed amount, exclusive of the bonus earnings. That result is compelled, in our view, by the consistent rulings of our Supreme Court in applying § 23–1041(C) to situations very similar to this one. *Marum v. Industrial Comm'n*, 81 Ariz. 296, 305 P.2d 443 (1956); *Miami Copper Co. v. Schoonover*, 65 Ariz. 239, 178 P.2d 554 (1947); *Wells v. Industrial Comm'n*, 63 Ariz. 264, 161 P.2d 113 (1945), *overruled on other grounds, Sanchez v. Industrial Comm'n*, 96 Ariz. 19, 391 P.2d 579 (1964); *Kennecott Copper Corp. v. Industrial Comm'n*, 61 Ariz. 387, 149 P.2d 687 (1944). We must agree with respondent that this case is governed by the decision in *Marum* where, as here, all employees engaged in the same activity as the applicant were working under a contract permitting bonus payments, and where, as here, employees whose productivity did not earn them bonus payments were, nevertheless, paid the guaranteed wage.

Petitioner attempts to distinguish *Marum* by pointing out that in *Marum* wages under the bonus contract were computed separately and a comparison was made between the contract earnings and the guaranteed wage, whereas in this case, bonus earnings were simply added to the guaranteed wage. However, this difference in the manner of computation is not a material distinction with respect to the applicability of A.R.S. § 23–1041(C). In both this case and *Marum*, no employees doing a particular activity were paid less than guaranteed wage.

The petitioner's reliance on *Barron v. Ambort*, 64 Ariz. 209, 167 P.2d 925 (1946), is misplaced. That case involved an employee who was guaranteed a monthly wage of $75.00 plus a four percent commission on all sales. As distinguished in the subsequent cases of *Miami Copper Co. v. Schoonover*, and *Marum*, the "contract earnings" and the "guaranteed wage" in *Barron* were identical. All employees were paid the $75.00 plus the four percent commission. No employee doing any productive work whatsoever was paid only $75.00. Thus, "there was no guaranteed wage payable 'notwithstanding the contract price'" so as to come within the provisions of the statute. *Miami Copper Co. v. Schoonover*, 65 Ariz. at 241, 178 P.2d at 555. In this case, as in *Miami Copper, Kennecott Copper*, and *Marum*, the guaranteed wage was readily identifiable and was paid to those employees doing the same work who did not reach the incentive level.

■ Petitioner next contends that A.R.S. § 23–1041(C) is unconstitutionally vague. We must reject this argument, for not only has this statute been consistently applied, but our Supreme Court has previously stated that its language is "clear, unambiguous, and unequivocal." *Kennecott Copper Corp. v. Industrial Comm'n*, 61 Ariz. at 390, 149 P.2d at 688. *See also Marum v. Industrial Comm'n*, 81 Ariz. at 300, 305 P.2d at 446.

Finally, petitioner challenges the statute as violative of equal protection. The statute provides the methods for determining the average monthly wage for employees who have worked on the basis of a guaranteed wage or a contract bonus, rather than employees who work for only a wage. The provision is designed to deal with the problem of establishing a uniform wage rate in a situation in which actual earnings may have fluctuated. *See Marum v. Industrial Comm'n; Barron v. Ambort.* It appears that petitioner's major complaint in connection with equal protection is that the statute as applied affects only miners. However, nothing in this record would support that assumption and we note that the statute has been applied, in at least one instance, to a salesman. *Wells v. Industrial Comm'n*, 63 Ariz. 264, 161 P.2d 113 (1945), *overruled on other grounds, Sanchez v. In-*

*dustrial Comm'n,* 96 Ariz. 19, 391 P.2d 579 (1964).

The award is affirmed.

DONOFRIO and WREN, JJ., concur.