810 P.2d 602

**Antoinette T. DOLES, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Sun Health Corporation, Respondent Employer,**

**Industrial Indemnity Company, Respondent Carrier.**

**No. 1 CA–IC 89–014.**

Court of Appeals of Arizona, Division 1, Department C.

Dec. 11, 1990.

Review Denied May 21, 1991.

Mark Mignella, Phoenix, for petitioner.

Anita R. Valainis, Chief Counsel, the Indus. Com'n of Arizona, Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Donald L. Cross, J. Victor Stoffa, Phoenix, for respondents Employer and Carrier.

OPINION

FIDEL, Presiding Judge.

The Industrial Commission found that a permanently disabled employee had no loss of earning capacity. Because in reaching this conclusion, the Industrial Commission inappropriately considered earnings derived from sheltered employment, we set its award aside.

## HISTORY

Petitioner employee (claimant), a physical therapist since 1965, worked for respondent employer (Sun Health) from 1971 to 1986 and became skillful in the care of elderly patients. After injuring her back in 1972, claimant worked part-time for Sun Health.

In September 1986, when she was 46 years old, claimant injured her back again at work. In July 1987, she was discharged with a 10 percent permanent impairment. Her treating physician prohibited bending and imposed strict limitations on sitting, standing, walking, stooping, and lifting. In light of these limitations, Sun Health created and offered claimant a new position evaluating, planning, and supervising physical therapy programs. Although her treating physician approved the position, claimant refused Sun Health's offer and made no other effort to get work.

The commission issued an interim award for permanent partial disability based on an earning capacity as a parking lot cashier. Both claimant and Sun Health's compensation carrier (Industrial Indemnity) protested this award.

Testimony at hearing established that Sun Health undertook by policy to reemploy disabled workers. To reemploy claimant, Sun Health created a modified physical therapist position by consolidating tasks previously performed by other therapists. This position, had claimant accepted it, would have freed other therapists to spend more time providing direct care and would have capitalized on claimant's experience and skill. The job was offered only to claimant; such a job was not available in the competitive labor market. One other employer had administrative positions open, but no evidence established their availability to claimant.

Claimant testified that she did not believe that she could work in the modified physical therapist position or in any other position and that she spent her time watching television seeking ideas for children's stories she wished to write. Labor consultants for the parties gave disparate testimony regarding the suitability of lower paying work outside Sun Health, but this testimony played no part in the Commission's decision.

The administrative law judge rejected the credibility of claimant's description of her symptoms and found the modified position at Sun Health both suitable and available. He also found that Sun Health had not offered the position out of sympathy, but rather to take advantage of claimant's expertise. His conclusion that claimant had no loss of earning capacity is the subject of our review.

## DISCUSSION

■ The administrative law judge found "that the applicant does not in good faith intend to return to employment." However, a claimant need not make a good faith effort to find work if no suitable employment is available. We stated in *D'Amico v. Industrial Comm'n*, 149 Ariz. 264, 717 P.2d 943 (App.1986):

> Arizona's statutory scheme does not require that a claimant always prove his reduced earning capacity by showing an unsuccessful good faith effort to obtain suitable employment. A claimant may meet his burden of proof by relying upon expert testimony to show the type of work the claimant is able to perform with his industrial injuries, and the amount which would be earned in such employment.

149 Ariz. at 266, 717 P.2d at 945 (quoting *Franco v. Industrial Comm'n*, 130 Ariz. 37, 39, 633 P.2d 446, 448 (App.1981)) (citations omitted).

Claimant undertook to satisfy her burden in accordance with *D'Amico* by offering expert testimony that, given her age, education, experience, and physical limitations, no suitable position was reasonably available to her in the Phoenix metropolitan area except for the sheltered position offered by Sun Health. Although the carrier countered with evidence of suitable light work (telephone solicitor, parking lot attendant, convenience store cashier), it presented no testimony that such work was reasonably available to claimant. The only

job proven available was Sun Health's special physical therapist position, a job the competitive labor market offered to no others. Because only this position was considered by the administrative law judge, the issue narrows to whether this modified position accurately established claimant's earning capacity.

## A. *Rejection of Modified Employment*

We dispose at the outset of respondents' argument that the award may be sustained because the claimant rejected an offer of modified employment. Respondents base this argument on *Bierman v. Magma Copper Co.*, 88 Ariz. 21, 352 P.2d 356 (1960), a considerably different case. In *Bierman*, an employer offered a disabled miner light work bundling wedges, and the miner refused because "he knew he could not do it." *Id.* at 22, 352 P.2d at 357. The Commission found, however, that he could "do it," and determined the miner's residual earning capacity by considering the proffered wages. The parties disputed in *Bierman* whether the claimant was physically able to perform the proffered work, and the supreme court affirmed the Commission's disposition in deference to its fact-finding on that essential issue. The essential issue in this case, by contrast, is not whether claimant can physically perform the proffered work, but whether the work accurately measures claimant's earning capacity in a competitive labor market. *Bierman* does not address that issue and has no bearing on this case.

## B. *The Competitive Labor Market Test*

■ Earning capacity is the wage the injured worker can achieve in the competitive labor market:

> The problem of determining the future earning capacity of a disabled man involves a certain amount of indefiniteness. The object is to determine as near as possible whether in a *competitive labor market* the subject in his injured condition can probably sell his services and for how much.

*Davis v. Industrial Comm'n*, 82 Ariz. 173, 175, 309 P.2d 793, 795 (1957) (emphasis added); *accord, e.g., Zimmerman v. Industrial Comm'n*, 137 Ariz. 578, 672 P.2d 922 (1983); *see also* 2 A. Larson, *Workmen's Compensation Law* § 57.20 at 10–30 (1989) ("The ultimate objective of the disability test is ... to determine the wage that would have been paid in the open market under normal employment conditions to claimant as injured.").

■ Earning capacity, however, cannot be accurately measured by make-work or sheltered work. *Allen v. Industrial Comm'n*, 87 Ariz. 56, 347 P.2d 710 (1959).

In *Allen*, the employer rehired at full salary a tire shop employee whose permanent injuries impaired the efficiency of his work. The employee was obliged, as before his injury, to change tires, but could now change fewer than before. The employer, who rehired the employee because of a policy to keep disabled workers at their former pay, admitted that the employee probably would not have been hired in the competitive labor market. The supreme court set aside the commission's finding of no loss of earning capacity. The court observed that if the employee were forced into a competitive market, he would be unable to find equivalent work. 87 Ariz. at 67–68, 347 P.2d at 717–18.

*Allen* was followed by the North Carolina Supreme Court in *Peoples v. Cone Mills Corp.*, 316 N.C. 426, 342 S.E.2d 798 (1986). There, when a cotton mill card room supervisor developed an occupational respiratory impairment, his employer reemployed him in its supply room, but this environment proved too dusty and the lifting requirements too onerous. The employer then offered a specially created supply room position in a dust free environment where the employee, at his original salary, would face no lifting duties and could work flexible hours. This position was open only to the employee, and no other employer in the region offered similar employment. The North Carolina Supreme Court rejected the employer's argument that this modified position represented the employee's earning capacity:

> The *Allen* and *Ashley* [*v. Rent–A–Car Co.*, 271 N.C. 76, 155 S.E.2d 755 (1967)]

cases rest on the principle that an injured employee's earning capacity must be measured not by the largesse of a particular employer, but rather by the employee's own ability to compete in the labor market. If post-injury earnings do not reflect this ability to compete with others for wages, they are not a proper measure of earning capacity.

....

Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level.

*Id.* at 437, 342 S.E.2d at 805–06. The operative principle in *Peoples,* as in *Allen,* was that earning capacity must be measured by competition in the open labor market.

Respondents urge us to modify the approach of *Peoples* and *Allen,* however, in accordance with *Cramer v. Industrial Comm'n,* 19 Ariz.App. 379, 507 P.2d 991 (1973), a somewhat dissonant opinion by this court. In *Cramer,* a lineman was rehired by his employer as an estimator after losing an arm and a leg in an industrial accident. The employer accommodated the employee's handicap by supplying a specially equipped vehicle but, unlike the present employer, did not create a special job. An estimator's position was common in the labor market. And though the employee offered evidence that he would have had trouble competing for such a job, the evidence also established that, by using the special vehicle, he was fully able to perform the job's demands. As his supervisor stated, "I believe he would rate right up with the best." *Id.* at 380, 507 P.2d at 992.

The *Cramer* court acknowledged the supreme court's focus on the competitive labor market. *Cramer* interpreted "competitive labor market," however, as "words of art" denoting the court's attempt "to ascertain ... to what extent a workman's injuries, by themselves and acting alone, affect his or her ability to earn a living, taking into consideration his or her non-injury attributes such as education, skills, training, etc." *Id.* at 381, 507 P.2d at 993. The court concluded that, "where an injured

workman has post-injury earnings, lack of evidence of employability by other employers does not by itself preclude a finding of earning capacity." *Id.* at 381, 507 P.2d at 993.

*Cramer* is factually distinguishable from this case. There, the employer did not accommodate impairment by extending the employee a special job but by extending him an ordinarily available job that the employee was fully able to perform. Moreover, the supreme court has not adopted *Cramer's* suggestion that "competitive labor market" is merely a term of art. To call something a "term of art" is to accord oneself the freedom to redefine it in more congenial terms. The supreme court, however, has resisted *Cramer's* redefinition and continues to characterize employability in the competitive labor market broadly as a universal standard:

The universally recognized ultimate issue in determining loss of earning capacity is: "to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much."

*Zimmerman v. Industrial Comm'n,* 137 Ariz. 578, 583–84, 672 P.2d 922, 927–28 (1983) (quoting *Davis v. Industrial Comm'n,* 82 Ariz. 173, 175, 309 P.2d 793, 795 (1957)); *see also W.F. Dunn, Sr. & Son v. Industrial Comm'n,* 160 Ariz. 343, 773 P.2d 241 (App.1989). We conclude that the *Allen* standard of employability in a competitive labor market is a firm and objective standard and the necessary measure of claimant's earning capacity in this case.

This is not to say that *Allen* is indistinguishable from this case. There, the employee was retained out of sympathy in an ordinary job that he could not effectively perform. Here, though the employer created a special job, it did so to make use of claimant's past experience. This distinction, however, does not erase the material fact—determinative in *Allen*—that the wages offered claimant were "sheltered" wages that

reflect not the employee's earning capacity in a competitive situation, but rather a

company policy which, if abrogated for any reason by the employer, will force an employee into a position where he will be unable, because of his injuries, to continue to earn such wages or secure equivalent employment.

*Allen,* 87 Ariz. at 67–68, 347 P.2d at 718.

### C. *The Problem of Sheltered Employment*

Respondents raise a troubling public policy objection to the strict rejection of sheltered wages as a measure of earning capacity. That approach, respondents argue, undercuts incentive for employers to accommodate the needs of disabled workers and attempt to keep them on the job.[1] We acknowledge this concern. The law should encourage, not discourage, employers to make the kind of effort that Sun Health made here. As an intermediate appellate court, however, we lack authority to abandon a standard that our supreme court has chosen to maintain.

Moreover, if we had the authority to modify the competitive labor market test, we would presently hesitate to do so. If the law should change to reflect the wages of sheltered employment in a disabled worker's present earning capacity, the law must also provide adequate assurance that the worker will not be made a captive of the sheltered job and of the abrogable policy or transient attitude of one employer. *Allen,* 87 Ariz. at 67–68, 347 P.2d at 718. As the North Carolina Supreme Court explained:

> The rationale behind the competitive measure of earning capacity is apparent. If an employee has no ability to earn wages competitively, the employee will be left with no income should the employee's job be terminated.

*Peoples,* 316 N.C. at 438, 342 S.E.2d at 806.

Respondents point out that an Arizona statute enacted after *Allen* would provide a degree of protection from the earnings loss that would follow cessation of a shel-

tered job. Ariz.Rev.Stat.Ann. § 23–1044(F)(2) (1983) requires the Industrial Commission to recalculate a disabled worker's earning capacity and compensation, even though the worker's physical condition is unchanged, "[u]pon a showing of a reduction in the earning capacity of the workman arising out of such injury subsequent to the findings and award."

This statute goes part way to answer the concerns that underlie the *Allen* view of sheltered employment. A sheltered employee laid off for economic reasons, for example, might successfully petition for adjusted compensation that reflects his reduced or non-existent earning capacity in the competitive labor market. We do not believe, however, that in the enactment of this statute, the legislature contemplated the special problems of a *captive* disabled employee.

The Court of Appeal of Louisiana recognized such problems when it stated:

> We do not wish ... to deny an injured worker the right to refuse to work for his former employer or terminate his employment relationship at the risk of losing his right to ... [benefits]. This could place a worker in the tenuous position of working under unbearable or demeaning circumstances should an unscrupulous employer desire to eliminate [benefits] by coercing the worker into refusing an employer's offer of employment or coercing him subsequent to returning to work....

*Payne v. Country Pride Foods, Inc.,* 525 So.2d 106, 107 (La.Ct.App.1988); *see also Ashley v. Rent–A–Car Co.,* 271 N.C. 76, 85, 155 S.E.2d 755, 762 (1967) ("Must claimant continue to be employed by the same employer against his will in order to receive payment of compensation?").

In *Peoples,* the North Carolina Supreme Court recognized that related concerns extend even to a sheltered worker dismissed for horseplay, who would lack a similarly

---

**1.** An employer has a statutory obligation to accommodate a handicap. *See* Ariz.Rev.Stat.Ann. § 41–1463(B)(3) (1985) (unlawful employment practice to fail or refuse reasonably to accommodate handicap). One state court has extend-

ed the duty to accommodate to modification of peripheral duties. *See Rancour v. Detroit Edison Co.,* 150 Mich.App. 276, 388 N.W.2d 336 (1986).

dismissed competitor's capacity to find equivalent wages in an unsheltered job. 316 N.C. at 438, 342 S.E.2d at 806.

To develop an appropriate public policy in this area requires a delicate balancing of interests. The law should encourage employers to rehire the disabled, yet not make disabled workers captives of one job. We urge the legislature to explore these issues; in a legislative forum all interests may be heard from as the balance is struck. The present law, however, is embodied in the competitive labor market test of *Allen,* and we apply that law to conclude that the administrative law judge inappropriately considered a proffer of sheltered wages in determining the claimant's earning capacity in this case.

The Industrial Commission award is set aside.

GERBER and EUBANK, JJ., concur.