823 P.2d 1283

**ARIZONA DEPT. OF PUBLIC SAFETY, Petitioner Employer,**

**State Compensation Fund, Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Daniel T. Gibson, Respondent Employee.**

No. 1 CA–IC 89–153.

Court of Appeals of Arizona, Division 1, Department A.

April 4, 1991.

Review Granted Feb. 19, 1992.

Christopher E. Kamper, Chief Counsel, State Compensation Fund by Christopher O. Anderson, Phoenix, for petitioners Employer and Carrier.

Anita R. Valainis, Chief Counsel, Indusl. Com'n, Phoenix, for respondent.

Taylor & Schaar by Richard E. Taylor, Phoenix, for respondent Employee.

## OPINION

CONTRERAS, Judge.

This is a special action review of an Arizona Industrial Commission award for permanent partial disability based upon respondent employee's (claimant's) current employment. The issue presented for review is whether the Administrative Law Judge erroneously excluded a labor consultant's opinion that claimant's date of injury employment as an administrative sergeant for petitioner employer Arizona Department of Public Safety (DPS) was suitable and would have been available to him except for a post-injury termination for misconduct. Because we conclude that the exclusion was harmless and the job related misconduct does not justify a forfeiture of permanent disability benefits, we affirm the award.

Claimant was a DPS patrolman for approximately seven years. By 1977, he had been promoted to an administrative sergeant, a supervisory position. In December 1977, claimant strained his neck at work. Petitioner carrier State Compensation Fund (Fund) accepted compensability. By early February 1978, claimant had resumed regular work. His claim was ultimately closed with a 5% permanent physical impairment but without permanent disability.

In July 1980, DPS terminated claimant for off-duty misconduct involving an extramarital affair, an altercation, and a drinking problem. Claimant brought an administrative appeal within the merit system, but the termination was upheld.

In March 1981, claimant filed a petition to reopen the neck injury claim. The Fund accepted reopening. In May 1982, the Fund changed claimant's disability status from temporary total to temporary partial because he was working as a bar manager. In March 1983, the claim was reclosed because claimant's symptoms had decreased and he had declined surgery. Claimant also stipulated that he had no loss of earning capacity, and an award was entered to that effect.

In April 1984, claimant again filed a petition to reopen the claim. The Fund also accepted this petition. While the claim remained open, the Fund periodically adjusted claimant's temporary disability status, but the record is unclear whether temporary partial benefits were actually paid. In February 1988, the Fund reclosed the claim with the same 5% permanent physical impairment.

In March 1988, the Fund submitted an earning capacity recommendation to the Industrial Commission. *See generally* A.R.S. § 23–1047, subd. A. This recommendation indicated that claimant could not return to his regular work at DPS but that he had a monthly earning capacity of some $1020.00 as an administrative assistant in a financial institution. The Industrial Commission rejected this recommendation and found that claimant had a monthly earning capacity of some $770.00 as a security guard. The Fund protested this award, and a hearing was scheduled. *See generally Le Duc v. Industrial Comm'n,* 116 Ariz. 95, 567 P.2d 1224 (App.1977).

At the ensuing hearing, claimant acknowledged that the July 1980 termination from DPS resulted from an "incident off duty" involving an affair, an altercation, and a drinking problem. Claimant conceded that his current physical condition would enable him to work as an administrative sergeant for DPS. Claimant also testified that since the termination, he had worked only sporadically and that until the February 1988 termination notice, the Fund had paid him temporary disability benefits except when he was able to work. Finally, claimant testified that after the termi-

nation, he had found suitable work as an eligibility worker for the Arizona Department of Economic Security (DES).

Also appearing at the initial and at a continued hearing were a medical expert, a DPS supervisor, and two labor consultants. Neurosurgeon William Helme, M.D., testified that claimant's neck condition resulted in functional limits but that the positions of administrative sergeant and eligibility worker were suitable. The DPS supervisor testified that DPS employs some 40 administrative sergeants. Finally, both labor consultants testified concerning claimant's current earning capacity in the general labor market. The Fund also sought its consultant's opinion about whether claimant could have continued to work for DPS as an administrative sergeant except for his termination caused by his misconduct. The Administrative Law Judge excluded this evidence. The Fund responded with the following argument and offer of proof:

> The reason that I would like to go into this area, Your Honor, is because it's pertinent as to what his present earning capacity would be. But for his misconduct, that misconduct occurred after the date of injury, and it would be the defendants' position that that misconduct should not weigh in the determination as to what his earning capacity is.
>
> Otherwise, what we would do is we will allow people to damage their earning capacity after the injury and then the defendants become responsible for their reduced loss of earning capacity and that is not the intent of the Workers' Compensation System, nor would it be just to the defendants, as they have no control over the applicant doing that.
>
> It would be analogous, Your Honor, to, for example, an injured workman moving to a new location, new geographic area in which the job availability is considerably lower causing him to have a reduced earning capacity simply because of there not being a market in this new geographic location for his skill. That type of behavior, actually—

THE JUDGE: I think that is an adequate enough explanation. At this time, why don't you make an offer of proof if you feel it is appropriate.

. . . .

MR. ANDERSON: I believe the evidence would show, Your Honor, that it's Mr. Taylor's opinion that he would be able to continue on in a position as a sergeant with the Department of Public Safety even to today performing administrative work which would have been within the limitations—physical medical limitations which were a result of this injury of 12/22/77, and as a result of that, he would have no loss of earning capacity due to this injury. That would conclude my offer of proof.

The Administrative Law Judge then issued the award for permanent partial disability based upon claimant's current earning capacity as an eligibility worker for DES. Regarding the Fund's argument that claimant's current disability was unrelated to the industrial injury because he was terminated from DPS for misconduct, the Administrative Law Judge found that the Fund had "offered no authority for this position nor has the court been able to find authority to support such finding." On administrative review, the Fund again cited no authority for its position. A substituted Administrative Law Judge [1] summarily affirmed the award. The Fund then brought this special action.

On review before the court, the Fund for the first time cites authority that it contends supports its defensive position. Claimant substantively answers the Fund's argument and also asserts that laches and estoppel apply to the Fund's defense. The Fund did not file a reply brief.

A failure to reply to arguments raised in an answering brief may justify a summary disposition of an appeal. *See, e.g., Turf Irrigation and Water Waterworks Supply v. Mountain States Tel. & Tel. Co.,* 24 Ariz.App. 537, 540 P.2d 156 (1975). In the present case, claimant asserted below that the Fund's defensive position was both un-

---

1. Pending administrative review, Administrative Law Judge Whitley resigned and this case was transferred to Administrative Law Judge Bayles for the decision upon review.

reasonably late and inconsistent with the position it had previously taken before the Commission. The Administrative Law Judge, however, did not rely on laches or estoppel. Although the Fund nevertheless should have replied to the applicability of these doctrines, we exercise our discretion to address the substantive merits of the Fund's defense.

The Fund presents its argument in terms of procedural harmful error resulting from the exclusion of the labor consultant's opinion. We disagree that this exclusion was harmful. *See generally, e.g., Pima Community College v. Industrial Comm'n,* 137 Ariz. 137, 669 P.2d 115 (App.1983) (error harmless if excluded testimony could not have swayed result). Expert opinion was unnecessary because claimant himself conceded that the DPS position remained suitable and it is uncontroverted that claimant would have no lost earning capacity if he was still working for DPS. The real issue is not the exclusion of the unnecessary opinion, but the substantive effect of the termination which was due to claimant's misconduct. We therefore turn to the Fund's argument and the authority presented to support and rebut it.

The first premise of the argument is the general principle that a compensable disability must result from the industrial injury. The second premise is the uncontroverted assertion that claimant would have no loss of earning capacity if he had not been terminated from DPS for post-injury misconduct. From these premises, the Fund concludes that claimant's current loss of earning capacity is unrelated to his industrial injury.

To support this argument, the Fund cites one statute and three cases: A.R.S. § 23–1044, subd. C; *Hoppin v. Industrial Comm'n,* 143 Ariz. 118, 692 P.2d 297 (App. 1984); *Bryant v. Industrial Comm'n,* 21 Ariz.App. 356, 519 P.2d 209 (1974); and *Todd v. Hudson Motor Car Co.,* 328 Mich. 283, 43 N.W.2d 854 (1950), *cited in United Riggers Erectors v. Industrial Comm'n,* 131 Ariz. 258, 640 P.2d 189 (App.1981). To rebut this argument, claimant cites *Schnatzmeyer v. Industrial Comm'n,* 77

Ariz. 266, 270 P.2d 794 (1954), *Fletcher v. Industrial Comm'n,* 120 Ariz. 571, 587 P.2d 757 (App.1978), and *Oquita v. Industrial Comm'n,* 120 Ariz. 610, 587 P.2d 1187 (App.1978).

Section 1044, subd. C of Title 23 prescribes how compensation for unscheduled industrial injuries is to be computed. Compensation is provided "where the injury *causes* permanent partial disability for work" based upon "the amount which represents ... [the] reduced monthly earning capacity *resulting from the disability."* A.R.S. § 23–1044, subd. C (emphasis added).

*Hoppin* involved a claimant with multiple sclerosis. The court indicated that any disability resulting exclusively from the natural progression of this disease after the industrial injury would be noncompensable. *See Hoppin v. Industrial Comm'n,* 143 Ariz. at 125, 692 P.2d 297 (dictum).

*Bryant* involved an impaired but nondisabled worker, who left his post-injury employment to take a more lucrative position. When the opportunity proved illusory, he was unable to return to the post-injury employment because of general economic conditions. His petition to rearrange was denied, and this court affirmed:

> While this Court is *not holding that a disabled workman must return to his former employment if he is able and remain there,* we are holding that where the predominant cause of an injured workman's changed economic status is of his own making and is similar to the *risks encountered by all members of society,* the Industrial Commission will not subsidize the injured worker for his miscalculations to the exclusion of the uninjured members of the work force.

*Bryant v. Industrial Comm'n,* 21 Ariz. App. at 357–58, 519 P.2d 209 (emphasis added).

*Todd* involved a partially disabled worker who was terminated from a light-work position for gambling. He subsequently found equivalent work, but he claimed compensation for the intervening unemployment. This claim was denied because the worker's misconduct, not the industrial injury,

caused the unemployment. *See Todd v. Hudson Motor Car Co.*, 43 N.W.2d at 857.

Finally, *Schnatzmeyer* established that a compensable disability need only be partially related to the industrial injury. *See Schnatzmeyer v. Industrial Comm'n*, 77 Ariz. at 270–71, 270 P.2d 794. *Fletcher* and *Oquita* applied this principle to partially disabled workers who lost their light-work positions because of general economic conditions. *Cf. Fletcher v. Industrial Comm'n*, 120 Ariz. at 572–75, 587 P.2d 757 (rearrangement denied because unemployment wholly unrelated to industrial injury) *with Oquita v. Industrial Comm'n*, 120 Ariz. at 610–12, 587 P.2d 1187 (rearrangement permitted because, although loss of light-work position was the result of economic conditions, evidence established that industrial injury contributed to subsequent inability to compete for suitable and available work).

The present case significantly differs from the cited authority. On one hand, the disabilities in *Hoppin, Bryant, Todd,* and *Fletcher* were wholly unrelated to the industrial injuries. In *Bryant*, for example, rearrangement was denied not because the worker would have remained employed if he had not left his secure position, but because his current unemployment resulted from general economic conditions. In contrast, the current claimant's disability is partially work-related because he is unable to perform heavy-duty work that would pay as much as his former relatively high paying light-work position as an administrative sergeant. On the other hand, except for *Todd*, none of the cited cases involved misconduct. As for *Todd*, the sanction for misconduct was a temporary loss of compensation, not a forfeiture of permanent disability benefits. The current case admittedly involves misconduct, however, the sanction that the Fund seeks is forfeiture.

The parties have not cited Larson, but he directly discusses the problem of misconduct and forfeiture:

> If the record shows no more than that the employee, having resumed regular employment after his injury, was fired for misconduct, with the impairment playing no part in the discharge, it will not support a finding of compensable disability. *But if to this record there is added evidence that the claimant has been hampered by his impairment in obtaining or holding other employment, the question is not quite so one-sided . . . .*
>
> It is true that claimant's successful return to his regular job is logically an almost insuperable obstacle to [a] finding of disability. Perhaps the only way in which the penalty for a moment's fighting can be adjusted to something more appropriate than forfeiture of all compensation rights would be legislation comparable to those Unemployment Compensation provisions which handle discharge for misconduct and voluntary quitting by a penalty of a limited number of weeks' compensation rather than complete loss of benefits.

2 A. Larson, *Workmen's Compensation Law* § 57.64(a) at 10–264 to –269 (1989) (footnotes omitted) (emphasis added).

We note that courts in other jurisdictions have rejected the draconian and severe consequence of forfeiture. *See, e.g., Fielding v. George A. Hormel Co.*, 439 N.W.2d 12 (Minn.1989); *Marsolek v. George A. Hormel Co.*, 438 N.W.2d 922 (Minn.1989). Indeed, Michigan cases after *Todd* have concluded that the effect of the industrial injury on the job search after discharge is relevant. *See, e.g., Scott v. Kalamazoo College*, 77 Mich.App. 194, 258 N.W.2d 191 (1977).

The Workers' Compensation Act is remedial and must be liberally interpreted to effectuate its purpose. *See, e.g., Circle K Store # 1131 v. Industrial Comm'n*, 165 Ariz. 91, 796 P.2d 893 (1990). In our opinion, the ultimate sanction of forfeiture is contrary to this remedial purpose. The Administrative Law Judge properly considered the effect of claimant's industrial injury on his post-discharge employability. *Cf. Dunn v. Industrial Comm'n*, 160 Ariz. 343, 773 P.2d 241 (App.1989) (position that impaired worker could have performed and obtained but for pre-injury felony conviction did not realistically represent earning

capacity after industrial injury). Furthermore, because the Fund did not argue that claimant's benefits should be temporarily suspended, we reserve for another day the question of whether an Administrative Law Judge has discretion in the appropriate case to temporarily suspend benefits when a claimant's own misconduct partially contributes to his lost earning capacity. *Cf. Marsolek v. George A. Hormel Co.*, 438 N.W.2d at 923–24 (benefits suspended until worker demonstrates that industrial injury affected ability to find or hold new employment).

For the foregoing reasons, the award is affirmed.

TAYLOR, P.J., concurs.

LANKFORD, Judge, dissenting.

I respectfully dissent.

The questions presented in this proceeding are: (1) whether the administrative law judge erred in concluding that the claimant's termination from employment for misconduct was irrelevant, and (2) whether the judge erred in excluding evidence offered by the State Compensation Fund that claimant's discharge was the cause of his diminished earning capacity.

Resolution of these questions requires the interpretation of a statute, which is an issue of law reviewable *de novo* on appeal. *Arizona State Board of Accountancy v. Keebler*, 115 Ariz. 239, 564 P.2d 928 (App. 1977).

The statute involved is A.R.S. § 23–1044, subd. C, which governs compensation for unscheduled permanent partial industrial disability. The statute conditions compensation on proof of two facts: that the industrial injury *caused* the disability, and that the reduced earning capacity *resulted from* the disability: "[W]here the injury causes permanent partial disability for work, the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting

from the disability ..." A.R.S. § 23–1044, subd. C.

Prior Arizona cases do not resolve how this provision should be applied in a case in which the employee has been terminated for misconduct after returning to his regular job following an injury. Nor does the statute specifically address this situation.

Our duty in interpreting any statute is to follow the Legislature's intent, *Calvert v. Farmer's Ins. Co.*, 144 Ariz. 291, 697 P.2d 684 (1985), and our first recourse is to examine how that intention was expressed in the language of the statute. *See Walker v. City of Scottsdale*, 163 Ariz. 206, 786 P.2d 1057 (App.1989).

The statutory language requires both that the claimant's loss be caused by the disability, and that the disability in turn be caused by the industrial injury. In this case, there is no question that an industrial injury caused a partial disability. The only question is whether the disability caused the diminished earning capacity as a matter of law, despite evidence that the real cause was claimant's termination for misconduct.

The very existence of a statutory requirement of causation demonstrates that the Legislature contemplated that factors other than the industrial injury might cause an employee's disability, and that factors other than disability might cause a loss of earning capacity. Nothing in the statute directs the Commission to disregard termination for misconduct as a possible cause of reduced earning power.

The pivotal fact in this case is that the claimant was perfectly able to continue his pre-injury employment.** In fact, he resumed his regular work as administrative sergeant for about two and one-half years before his termination. Consequently, this is at least arguably not a situation in which the termination for misconduct had no possible effect on claimant's earning capacity because the injury alone would disqualify him from work which offers earnings equal to his former employment.

The majority opinion expresses concern that denying compensation for losses

---

** Because claimant successfully returned to his regular work, this case does not involve the effect of "sheltered work" on earning capacity.

*See Doles v. Industrial Commission,* 167 Ariz. 604, 810 P.2d 602 (App.1990).

caused by the worker's dismissal for just cause would work a "forfeiture" of benefits. The simple answer to this argument is that one cannot "forfeit" benefits to which one has no entitlement. Because the Legislature limited compensation to loss of earning capacity caused by a disability resulting from industrial injury, the claimant has no right to benefits unless he can establish causation. *See In re Estate of Bedwell*, 104 Ariz. 443, 454 P.2d 985 (1969); *Franco v. Industrial Commission*, 130 Ariz. 37, 633 P.2d 446 (App.1981) (applicant bears burden of proving causation of disability and of loss of earning capacity).

That this court may think the refusal of benefits "draconian and severe" (Maj. Opinion at 279, 823 P.2d at 1287) is of no significance, for it is the Legislature's prerogative to limit the scope of compensation. The Legislature has done so by requiring proof of causation as a condition to awarding benefits. Although the judiciary may agree with the leading authority on this subject that legislation could avoid the difficult all-or-nothing choice between either fully compensating the employee whose voluntary misconduct reduced his earnings or denying all benefits despite the presence of some disability, 2 A. Larson, *Workmen's Compensation Law* § 57.64(a) at p. 10–269 (1989), amending the statute is a legislative decision, not a judicial one.

Other states have confronted this issue and, while they are divided on the question, many do not agree with the position taken by the majority in this case. Most decisions appear to follow one of two courses of action in cases of this type. Some deny compensation when the employee resumed his regular employment after suffering the injury and later was discharged solely for misconduct. *E.g., Calvert v. General Motors Corp.*, 120 Mich.App. 635, 327 N.W.2d 542 (1982). *See* Larson, *supra* at p. 10–264.

Most jurisdictions treat the question of causation as one of fact when the employee presents evidence that his disability hindered his efforts to secure other employment. *See* Larson, *supra* at p. 10–267 to 269. When the employee fails to present evidence that the cause of his loss is the disability rather than the termination, these courts deny compensation or uphold the agency's decision to deny benefits. *E.g., Bob's Barricades, Inc. v. Catalano*, 414 So.2d 580 (Fla.App.1982); *Computer Sciences, Inc. v. Hendricks*, 382 So.2d 804 (Fla.App.1980); *Epprecht v. Curtis Wright Corp.*, 26 A.D.2d 888, 274 N.Y.S.2d 440 (1966); *Woodard v. Workmen's Comp. Appeal Bd.*, 49 Pa.Commw. 558, 411 A.2d 890 (1980). Other courts have remanded for the taking of evidence on causation and the entry of a finding by the agency. *E.g., Johnston v. Super Food Services*, 461 So.2d 169 (Fla.App.1984); *Scott v. Kalamazoo College*, 77 Mich.App.194, 258 N.W.2d 191 (1977); *Marsolek v. George A. Hormel Co.*, 438 N.W.2d 922 (Minn.1989).

The claimant here should have an opportunity to prove that the loss of earning capacity was caused by his industrially related disability rather than by his termination for misconduct. In my opinion, we should vacate the award, permit both the claimant and the Fund to present evidence regarding causation, and allow the administrative law judge to make a finding on this issue following the hearing.